**BOEING NORTH AMERICAN, INC., Appellant,**

v.

**James G. ROCHE, Secretary of the Air Force, Appellee.**

**No. 01–1011.**

United States Court of Appeals, Federal Circuit.

DECIDED: July 29, 2002.

Terry L. Albertson, Crowell & Moring LLP, of Washington DC, for appellant. Of counsel were Scott James Preston and Richard J. Ney, of Chadbourne & Parke, of Los Angeles, CA.

Lawrence N. Minch, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC,

for appellee. On the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; Deborah A. Bynum, Assistant Director; and J. Mark Powell, Attorney.

Clarence T. Kipps, Jr., Miller & Chevalier, Chartered, of Washington, DC, for amicus curiae. Of counsel was Lynda Troutman O'Sullivan.

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit Judge.

Acting *en banc*, the court today vacated the March 15, 2002, judgment in this case, and the panel's original opinion, which is reported at 283 F.3d 1320 (Fed.Cir.2002), was withdrawn. The *en banc* court reassigned the opinion to the panel for revision. The panel's original opinion is revised as follows:

Boeing North American, Inc. ("Boeing") appeals from the decision of the Armed Services Board of Contract Appeals ("Board") disallowing legal costs incurred in 1989, 1990, and 1991 for defending a shareholder derivative suit. *Boeing North American, Inc.*, ASBCA No. 49994, 00–2 BCA ¶ 30,970, 2000 WL 777149 (June 8, 2000). Because the Board applied the wrong legal standard when disallowing the costs and failed to make an assessment of the contractor's likelihood of prevailing in its defense of the shareholder suit, we vacate and remand for further proceedings.

## BACKGROUND

In December 1996 Rockwell International Corp. ("Rockwell") merged with a wholly-owned subsidiary of The Boeing Company and changed its name to Boeing North American, Inc. Before the merger, Rockwell was a large defense and aerospace contractor. Among the many contracts Rockwell had with the federal government was Contract No. F04704–90–C–0016 ("contract 16"), awarded by the United States Air Force to Rockwell on March 5, 1990, for inertial measurement units for use in missiles. Contract 16 included both firm fixed-price and cost-reimbursable line items, and had a total value of over $100 million.

The allowability of costs generally, and of selected costs in particular, is covered by subpart 31.2 of the Federal Acquisition Regulations ("FAR").[1] Contract 16 explicitly incorporated by reference numerous FAR provisions, including FAR § 52.216–7. That provision provided, *inter alia*, for reimbursement of costs "determined to be allowable by the Contracting Officer in accordance with subpart 31.2 of the Federal Acquisition Regulation[s]. . . ." Rockwell sought reimbursement of its legal defense costs incurred in the defense of a shareholder derivative action and of the plaintiffs' legal costs that Rockwell paid. The government urged that the costs were not allowable. The background of the dispute is as follows.

In June 1989 four Rockwell shareholders filed a shareholder derivative complaint in Los Angeles County Superior Court. *Citron v. Beall*, No. C728809 (Cal.Super. Ct., filed June 26, 1989) ("*Citron*"). The suit was brought against fourteen directors of the corporation (some of whom were also officers) and 200 unidentified "John Does" who were "officers, di-

---

1. Federal Acquisition Regulations are codified in Title 48 of the Code of Federal Regulations. Because Boeing contests the allowability of costs incurred in 1989, 1990, and 1991, the FAR provisions in effect during those years are relevant. Unless otherwise indicated, the relevant FAR provisions in effect as of October 1, 1989, did not change in 1990 or 1991. Also, unless otherwise indicated, all references to the FAR refer to the FAR in effect on that October 1, 1989, date.

rectors and other members of management and employees, who were involved in the wrongdoing complained of." The gravamen of the complaint was that the "defendants knowingly, recklessly, or culpably breached their fiduciary duties to the [c]orporation by ... failing to establish internal controls sufficient to insure that the [c]orporation's business was carried on in a lawful manner...." [2] On this appeal, the parties agree that the five instances of underlying misconduct alleged in the *Citron* suit were as follows.

First, the government brought a civil suit under the False Claims Act, 31 U.S.C. § 3730, alleging that Rockwell fraudulently mischarged the government for work performed on a Space Shuttle contract in 1975–77. In 1982, Rockwell entered a consent decree to settle the suit, under which it agreed to pay a $500,000 fine and to take corrective action to ensure that Rockwell would not make false claims or conspire to defraud the government in the future. Second, the government brought criminal charges against Rockwell for making false statements under 18 U.S.C. § 1001 in connection with work performed under a government contract in 1982. Rockwell pled guilty to this charge and was fined $1 million. Third, the government alleged that Rockwell had engaged in defective pricing related to a 1982–83 Global Positioning System subcontract. A grand jury indicted Rockwell and two Rockwell employees, charging them with fraud, mail fraud, and willfully making false statements. Rockwell pled guilty to two counts of the indictment under a plea agreement and was fined $5.5 million. Fourth, a civil

*qui tam* lawsuit was filed against Rockwell on behalf of the government under the False Claims Act, charging the company with permitting employees to use government assets for personal gain in 1984. In addition to the *qui tam* suit, the government convened a grand jury but decided not to prosecute Rockwell. The civil suit apparently was also dismissed. Fifth, Rockwell was the subject of a Department of Justice investigation of alleged illegal hazardous waste dumping and other environmental law violations between 1975 and 1989. In March 1992, after settlement of the *Citron* lawsuit, Rockwell pled guilty to four felony violations of the Resource Conservation and Recovery Act, one felony and five misdemeanor violations of the Clean Water Act, and agreed to pay a criminal fine of $18.5 million.

Rockwell responded to the *Citron* complaint by retaining counsel to represent the corporation in the suit and by hiring separate counsel to represent the director defendants named in the complaint, as required by Rockwell's by-laws. Rockwell also formed a special litigation committee ("SLC") (composed of three members of Rockwell's Board of Directors who were not named as defendants in the complaint) to investigate and report on the *Citron* allegations. The SLC also hired separate legal counsel to assist in the investigation and provide independent legal advice. In July 1990 the SLC prepared a report summarizing its conclusion that the *Citron* lawsuit was not reasonably likely to succeed and would be disruptive to Rockwell's ongoing businesses and that prosecution of

---

**2.** Compl. ¶ 14. The complaint alleged that the named defendants were "controlling persons of Rockwell and had the power and influence, and exercised the same, to cause Rockwell to engage in the illegal practices complained of" and that the unidentified defendants aided, abetted, and participated in the wrongful acts and conduct. *Id.* ¶¶ 16–17.

However, in their joint statement of facts here, the parties stipulated that the *Citron* "[c]omplaint did not directly allege that the director-defendants participated in, or had prior knowledge of, any of the ... instances of wrongdoing" described in the complaint. Jt. Statement of Facts ¶ 14.

the suit was not in the best interest of Rockwell or its shareholders. The SLC report recommended that Rockwell's counsel take steps to obtain a dismissal in favor of all defendants.

Defendants moved for summary judgment and submitted the SLC report in support of their motion. The court denied the summary judgment motion on July 16, 1991, because it was "not satisfied that there is 'no triable issue as to any material fact,' as to the good faith, the independence and the quality and character of the investigation of the Special Litigation Committee. . . ." Order at 1. In denying defendant's motion, the court stated "it would appear that, were this a trial, defendants would prevail on the present state of the record (though plaintiffs' counsel will quickly note that the proceeding[s] so far have hamstrung their discovery efforts)." *Id.* at 2.

Subsequently, on October 28, 1991, Rockwell and the *Citron* plaintiffs entered into a settlement agreement. In that agreement, the Rockwell defendants "vigorously den[ied] all liability with respect to any and all of the purported facts or claims alleged in the Complaint. . . ." Settlement Agreement at 4. Pursuant to the agreement, Rockwell agreed to maintain an Audit Committee that would, for at least three years, "meet at least annually with [Rockwell's] Vice President [of] Contracts, Pricing & Subcontracts to review policies and procedures and training programs designed to effect compliance with the laws and regulations applicable to federal government contracts." *Id.* at 7. Also pursuant to the agreement, Rockwell agreed to pay plaintiffs' attorneys' fees of up to $1.5 million. On October 29, 1991, the court dismissed the *Citron* action with prejudice

based on the settlement between the parties. The dismissal order, drafted by the parties and approved by the court, dismissed the complaint on the merits, released the defendants from liability for all claims that were, or might have been, asserted in the lawsuit, and awarded plaintiffs $1.4 million in legal fees and costs. The dismissal order additionally required Rockwell to indemnify the defendant directors against any expenses and legal fees incurred in connection with the lawsuit to the "fullest extent permitted" by the applicable Delaware law.[3] Under Delaware law, a corporation has the power to indemnify a director-defendant if the director "acted in good faith and in a manner the [director] reasonably believed to be in or not opposed to the best interests of the corporation." 8 Del. C. § 145(a) & (b) (2000).

In total, between 1989 and 1991, Rockwell incurred approximately $4,576,000 of legal fees and costs associated with the *Citron* action, including costs incurred for representing Rockwell, for representing the director defendants, for legal counsel to the SLC, and for reimbursement of the plaintiffs' legal fees and costs. Rockwell included these costs as general and administrative ("G & A") costs in its home office overhead for fiscal years 1989, 1990, and 1991, and it claimed reimbursement for a portion of the costs under its various contracts with the government. Rockwell allocated 33.2% of these costs to its cost-type and flexibly-priced government work and 66.8% of the costs to its commercial and firm-fixed-price work. Rockwell subsequently submitted a certified claim for $161.91 to the contracting officer based upon the share of the *Citron* costs included in the G & A expenses allocated to con-

---

**3.** The Dismissal Order provided in pertinent part that "Rockwell shall indemnify the Director–Defendants against expenses (including attorneys' fees) actually and reasonably incurred in connection with the Action to the fullest extent permitted by the laws of the State of Delaware." Dismissal Order ¶ 8.

tract 16. The parties agreed to treat this as a test case and stipulated that the Board's decision regarding the allowability of these costs to contract 16 would govern the allowability for all relevant contracts.

On May 15, 1996, the contracting officer issued a final decision disallowing the costs Rockwell claimed. ("Final Decision"). The contracting officer concluded that the costs were unreasonable under FAR § 31.201–3,[4] and therefore unallowable, because "Rockwell violated its 'responsibilities to the Government ... and the public at large.'" Final Decision at 1 (quoting FAR § 31.201–3(b)(3)). The contracting officer additionally disallowed the costs, pursuant to FAR § 31.204(c), which provides that allowability of costs not specifically addressed by the FAR is to be based on the principles of the FAR and the "treatment of similar or related ... items [that are specifically addressed under the FAR]." The contracting officer found Rockwell's legal costs to be "similar or related" to the costs incurred in connection with or related to mischarging of costs on government contracts, which are expressly unallowable under FAR § 31.205–15, and "similar or related" to costs for the unsuccessful defense of fraud charges, which are expressly unallowable under FAR § 31.205–47. Final Decision at 3.

Rockwell appealed the contracting officer's final decision to the Armed Services Board of Contract Appeals. The parties elected to submit the appeal on the record without a hearing. In its appeal to the Board, Boeing, as Rockwell's successor-in-interest, argued that Rockwell's costs were allowable because (i) the costs were ordinary, necessary, and allowable "professional services" costs under FAR § 31.205–33(b); (ii) the costs were reasonable in relation to the services rendered, pursuant

to FAR §§ 31.201–3 and 31.205–33(b); (iii) the costs were allocable to the contract because they conferred benefit to the contract, in accordance with FAR § 31.201–4; and (iv) the costs were not limited or disallowed by any FAR cost principles. *Boeing North American, Inc.,* slip op. at 10.

While the appeal was pending, this court decided *Caldera v. Northrop Worldwide Aircraft Services, Inc.,* 192 F.3d 962 (Fed. Cir.1999), and the Board required supplemental briefing concerning the impact of that case. In *Northrop,* we addressed the question whether certain legal costs were "allowable costs," 192 F.3d at 972, when the costs related to the defense of an action charging that the contractor wrongfully terminated several employees because the employees refused to participate in fraud against the United States. In that action, a state court found that the employees had been wrongfully terminated because they refused to commit fraud against the government. *Id.* at 965. The majority of our opinion was directed to the question whether the state court had determined that Northrop committed fraud and, if so, whether that determination should be given collateral estoppel effect in Northrop's suit to recover its legal defense costs. In a brief portion of our opinion, we concluded that recovery of the contractor's legal costs was not allowable because those costs were not allocable. *Id.* at 972. They were not allocable under FAR § 31.201–4 "because the government did not benefit from [the contractor's] defense of the [state court] lawsuit...." *Id.* at 972–73.

The Board denied Boeing's appeal in this case based on *Northrop* because there could be "no benefit to the Government in a contractor's defense of a third party lawsuit in which the contractor's prior vio-

---

**4.** FAR § 31.201–3 provides standards under which the reasonableness of a cost is determined. Reasonableness is one factor in de-termining the allowability of a cost under FAR § 31.201–2.

lations of federal laws and regulations were an integral element of the third party['s] allegations." *Boeing North American,* slip op. at 13. The Board reasoned that "but for" Rockwell's wrongdoing the *Citron* suit would not have been brought, and the costs would not have been incurred.

This timely appeal followed. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

Board findings of fact will be set aside if "arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if ... not supported by substantial evidence." 41 U.S.C. § 609(b) (2000). Legal determinations of the Board are reviewed without deference. *Id.*

### I

At the outset it is necessary to distinguish, as we have in other contexts,[5] between the concepts of cost allocability and cost allowability under the FAR. The issue here is one of allowability.

Allocability is an accounting concept involving the relationship between incurred costs and the activities or cost objectives (*e.g.,* contracts) to which those costs are charged. Proper allocation of costs by a contractor is important because it may be necessary for the contractor to allocate costs among several government contracts

or between government and non-government activities.

The concept of cost allowability concerns whether a particular cost can be recovered from the government in whole or in part. Cost allocability here is to be determined under the Cost Accounting Standards ("CAS"), 4 C.F.R. Parts 403, 410.[6] Allowability of a cost is governed by the FAR regulations, *i.e.,* the cost principles expressed in Part 31 of the FAR and pertinent agency supplements.

■ Although a cost may be allocable to a contract, the cost is not necessarily allowable. We have agreed with the general proposition that "costs may be assignable and allocable under CAS, but not allowable under [FAR]." *United States v. Boeing Co.,* 802 F.2d 1390, 1394 (Fed.Cir.1986).[7] And the FAR makes clear that "[w]hile the total cost of a contract includes all costs properly allocable to the contract, the allowable costs to the Government are limited to those allocable costs which are allowable pursuant to [FAR] part 31 and applicable agency supplements." FAR § 31.201–1(b) (2001).

To be sure, the FAR sometimes seems to blur the distinction between allowability and allocability and to suggest that allowability depends upon allocability. For example, when determining cost allowability under FAR subpart 31.2, the allocability of the cost is a factor to consider, along with reasonableness of the cost, relevant standards promulgated by the CAS Board, terms in the contract at issue, and any limitations set forth in FAR subpart 31.2. FAR § 31.201–2(a).[8] But this provision

---

**5.** *See, e.g., Rice v. Martin Marietta Corp.,* 13 F.3d 1563, 1565–67 (Fed.Cir.1993).

**6.** During the relevant time period, the CAS provisions were codified in Title 4 of the Code of Federal Regulations. They have since been codified at 48 C.F.R. Parts 9903 9904 (2001). Unless otherwise indicated, the relevant CAS in effect as of October 1, 1989, did not change in 1990 or 1991.

**7.** *Boeing* construed the Defense Acquisition Regulations ("DAR"), which comprised the

first three volumes of Title 32 of the Code of Federal Regulations through 1983. The FAR replaced the DAR effective April 1, 1984. The DAR, in turn, had replaced the Armed Services Procurement Regulations ("ASPR"), which had comprised the first three volumes of Title 31 of the Code of Federal Regulations. *See FMC Corp. v. United States,* 853 F.2d 882, 884 n. 2 (Fed.Cir.1988).

**8.** FAR § 31.201–2(a) provides that "[t]he factors to be considered in determining whether

merely codifies the general principle that a cost is not allowable if the cost cannot be allocated to a government contract. For example, a contractor's cost of certain materials (*e.g.,* nuts and bolts) may be allowable when the materials are used to perform a government contract (and the costs therefore can be allocated to the contract), but not when the materials are used to perform a contract with a private party. Thus, cost allowability may turn on whether the cost is allocable. On the other hand, even when a cost is allocable, it is not necessarily allowable. For example, a contractor's cost of materials (*e.g.,* nuts and bolts) used to perform a government contract may be allocable to the contract, but the cost may be unallowable if it is unreasonable (*e.g.,* if the contractor overcharges the government for the materials). *See* FAR §§ 31.201–2, 31.201–3.

■ In summary, the concept of allocability is addressed to the question whether a sufficient "nexus" exists between the cost and a government contract. *Lockheed Aircraft Corp. v. United States,* 179 Ct.Cl. 545, 375 F.2d 786, 794 (1967). The concept of allowability is addressed to the question whether a particular item of cost should be recoverable as a matter of public "policy." *Rice,* 13 F.3d at 1569.

## II

Boeing argues that the decision below confused the concepts of allocability and allowability, and that, when these concepts are properly distinguished, Rockwell's legal defense costs must be both allocable and allowable. The costs are argued to be allocable because they are part of G & A. Boeing urges that under the FAR no bene- fit to the government need be shown for a cost to be allocable, even if a nexus to a particular contract is necessary for a cost to be allocable. When properly viewed under allowability principles, Boeing argues, Rockwell's costs are also allowable under FAR § 31.205–33, because that regulation generally provides that costs for professional services are allowable, with certain specific exceptions contained in subsection (c).[9] According to Boeing, none of the exceptions of FAR § 31.205–33(c) (1991) is relevant here, so the costs must be allowable.

■ This panel is, of course, bound by our decision in *Northrop, see Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563, 19 USPQ2d 1111, 1117 (Fed.Cir.1991), and we reaffirm here our holding in *Northrop* that a contractor's legal costs are unallowable when incurred in the unsuccessful defense of a lawsuit that involved a judicial determination that the contractor sought to induce its employees to commit fraud against the government by the contractor. The question is whether we are also bound by the court's conclusion that the costs were not allocable because they did not benefit the government. In *Northrop,* we reasoned that:

> The Army argues that the cost is allocable only if there is some benefit to the government for incurring the cost. It is established that the contractor must show a benefit to government work from an expenditure of a cost that it claims is "necessary to the overall operation of the [contractor's] business." *See FMC v. United States,* 853 F.2d 882, 885 (Fed. Cir.1988); *Lockheed Aircraft Corp. v. United States,* 179 Ct.Cl. 545, 375 F.2d

a cost is allowable include the following: (1) Reasonableness. (2) Allocability. (3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart."

9. Subsection (c) was first adopted on December 21, 1990.

786, 793–94 (1967). The Board erred in failing to make a determination of whether or not [Northrop]'s defense of the Oklahoma lawsuit benefited the government. We can discern no benefit to the government in a contractor's defense of a wrongful termination lawsuit in which the contractor is found to have retaliated against the employees for the employees' refusal to defraud the government.

*Id.* at 972.

█ In *Northrop,* the government urged in its brief to this court that "[w]here the costs arise from the defense of wrongful conduct involving . . . fraud upon the Government, there is no reasonable benefit to the Government, and the legal costs are not allocable to the contract." Appellant's Br. at 27, *Northrop,* 192 F.3d at 967. However, the allocability issue was not contested in *Northrop.* The contractor did not address the issue of allocability and simply argued that the state court's judgment was not collateral estoppel, and that the costs were allowable because it was reasonable for Northrop to defend the suit based on the available evidence. Appellee's Br. at 21–40, *Northrop,* 192 F.3d at 968–69. Most significantly, neither party in *Northrop* addressed the provisions of the CAS promulgated by the CAS Board, which by statute has "exclusive authority to make, promulgate, amend, and rescind cost accounting standards . . . governing . . . allocation of costs to contracts with the United States." 41 U.S.C. § 422(f)(1) (2000). Nor was CAS discussed in our opinion. Under our established precedent we are not bound by *Northrop* on the issue of allocability under the CAS standards since the CAS issue was neither argued nor discussed in our opinion. *See, e.g., United States v. County of Cook, Illinois,* 170 F.3d 1084, 1088 (Fed. Cir.1999); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.,* 937 F.2d 1572, 1581, 19 USPQ2d 1424, 1431 (Fed.

Cir.1991); *see also Brecht v. Abrahamson,* 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (reaffirming longstanding rule that if a decision does not "squarely address[ ][an] issue," a court remains "free to address the issue on the merits" in a subsequent case); *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1334, 62 USPQ2d 1188 (Fed.Cir. 2002) *(en banc )* (holding that our earlier decision in *Heidelberg Harris, Inc. v. Loebach,* 145 F.3d 1454, 46 USPQ2d 1948 (Fed.Cir.1998), was not binding on the panel "because of unique circumstances in that case, and the parties' not having contested the issue . . . ."). We must accordingly decide whether the CAS renders these legal expenses allocable. We conclude that it does.

The CAS grew out of criticism of accounting and pricing practices of the defense industry in the 1960s, which led to an extension to the Defense Production Act of 1950 that called for the General Accounting Office ("GAO") to determine "the feasibility of applying uniform cost accounting standards to be used in all negotiated prime contract and subcontract defense procurements of $100,000 or more." Pub.L. No. 90–370, 82 Stat. 279 (1968). After the GAO determined that it would be feasible to establish and apply such uniform cost accounting standards, the CAS Board was established by Congress in 1970. Pub.L. No. 91–379, 84 Stat. 796 (1970). In 1980, Congress decided not to continue to fund the Board, and it was dissolved. However, in 1988, the Office of Federal Procurement Policy Act Amendments of 1988, Pub.L. No. 100–679, 102 Stat. 4055 (1988), established an Office of Federal Procurement Policy and established a new permanent and independent CAS Board within the office of Federal Procurement Policy. To achieve uniformity in government contracting costs, the new Board was given exclusive authority

to make, promulgate, amend, and rescind cost accounting standards. 41 U.S.C. § 422(f)(1) (2000).

█ The Cost Accounting Standards promulgated by the CAS Board are designed to achieve "uniformity and consistency" in allocating costs to government contracts. *Rice*, 13 F.3d at 1565. Boeing urges, and the government does not dispute, that CAS Parts 403 and 410 require G & A expenses, such as those at issue here, to be allocated to all of the contractor's final cost objectives. The CAS Board adopted this "full costing" allocation standard when it promulgated CAS Part 410, and the Board explained the concept of full costing in the preamble to the section:

> The Standard being promulgated today is based on the concept of full-costing of final cost objectives. For Government contracting purposes, both direct and indirect costs, including G & A expenses are allocable.... The Board has concluded that there is a beneficial or causal relationship between G & A expenses and all of the final cost objectives of a cost accounting period. Therefore, these costs are allocable to such final cost objectives.

CAS Part 410, Preamble A, at 367–368.

Even where costs are unallowable, CAS Part 405 prescribes standards governing the identification and accounting treatment of such unallowable costs. The CAS Part 405 standards are "predicated on the proposition that costs incurred in carrying on the activities of an enterprise—regardless of the allowability of such costs under Government contracts—are allocable to the cost objectives with which they are identified on the basis of their beneficial or causal relationships." CAS § 405.20(a)(2). In its prefatory comments to CAS Part 405, the CAS Board stated that

> recognition of the costs accounting concept that all costs incurred in carrying on the activities of an enterprise are

allocable to the cost objectives of the enterprise is essential to the maintenance of sound and consistent contract cost accounting.

38 Fed.Reg. 24195, 24196 (Sept. 6, 1973).

We have specifically held that, if there is any conflict between the CAS and the FAR as to an issue of allocability, the CAS governs. *United States v. Boeing Co.*, 802 F.2d 1390, 1395 (Fed.Cir.1986); *Rice*, 13 F.3d at 1565 n. 2. Here the CAS clearly renders Rockwell's legal defense costs allocable as part of G & A expenses.

Our earlier decisions in *Lockheed*, 375 F.2d at 794, and *FMC Corp. v. United States*, 853 F.2d 882, 885 (Fed.Cir.1988), relied on by the government as authority for the "benefit to the government" theory, do not supply any support for a rule that would base the allocability of a cost on the cost's "benefit to the government" as opposed to its nexus to government work. In *Lockheed*, the contractor sought to allocate a portion of its personal property taxes that were assessed with respect to commercial productive material used for government contracts. Our predecessor court held that the costs were allocable to the government contracts because payment of the taxes was necessary to the overall operation of the contractor's business. *Lockheed*, 375 F.2d at 796–97. Our predecessor court described the nexus required to show allocability, stating:

> The criterion in the ASPR [now the FAR] for allocating indirect costs is "benefit." This is explicit in paragraph [b] of [FAR § 31.201–4], and implicit in paragraph [c]. It is a kind of common sense approach to allocation. No one would quarrel with the general proposition that it is fair to allocate to government contracts the costs of services which facilitate performance of the particular contracts or are essential to the existence and continuance of the busi-

ness entity. But the burden will be on the contractor to show the benefit and a reasonable allocation among different government contracts and between government and commercial work generally.

*Id.* at 793–94.

In *FMC,* the contractor had sued another government contractor, alleging breach of a contract to provide parts for a system for use in the government's TRIDENT submarines. The parties settled the dispute after their work on the TRIDENT submarines was completed. FMC sought to allocate its legal costs incurred in connection with the dispute to other government contracts, as part of G & A costs, unrelated to its TRIDENT submarine contract because the TRIDENT contract had already been completed. We affirmed the Board's holding that these costs could not be allocated to the TRIDENT contracts. We found that "the alleged financial benefit to other government contracts from the TRIDENT settlement ... [was] 'too remote and insubstantial' to justify pro-rata allocation to other contracts of the TRIDENT legal fees as a G & A expense." *FMC,* 853 F.2d at 886. Despite *FMC's* use of the phrase "benefit to the government," *id.* at 886, it is clear that *FMC* interpreted the pertinent FAR allocability regulation to require that a contractor show "a 'benefit' from the expenditure to government work," *id.* at 885. Thus, *FMC* made clear that "benefit" was a concept requiring a contractor to show a nexus between the contractor's cost and the contractor's government work in order to allocate the cost to a government contract. *See also Dynalectron Corp. v. United*

*States,* 212 Ct.Cl. 118, 545 F.2d 736, 739 (1976) (holding, in a case decided before the adoption of the CAS, that a contractor's legal defense costs incurred in an action charging breach of a commercial contract were not allocable to government contracts because the contractor "failed to show that the legal fees had any relationship whatever to the Government contracts or their performance"). Neither *Lockheed* nor *FMC* considered whether, as a matter of policy, the costs were allocable.

■ Thus, we agree with Boeing that allocability is an accounting concept and that CAS does not require that a cost directly benefit the government's interests for the cost to be allocable. The word "benefit" is used in the allocability provisions to describe the nexus required for accounting purposes between the cost and the contract to which it is allocated. The requirement of a "benefit" to a government contract is not designed to permit contracting officers, the Board, or this court to embark on an amorphous inquiry into whether a particular cost sufficiently "benefits" the government so that the cost should be recoverable from the government. The question whether a cost should be recoverable as a matter of policy is to be undertaken by applying the specific allowability regulations, which embody the government's view, as a matter of "policy," as to whether the contractor may permissibly charge particular costs to the government (if they are otherwise allocable).

Our view that the question here is one of allowability is confirmed by the government brief in this very case that ultimately treats the issue as one of allowability,[10] and

---

10. In the concluding portion of its brief, the government acknowledges that "the CAS Board's 'full costing approach' ... requires the allocation of all costs to final cost objectives," Appellee's Br. at 27, but urges that "the CAS simply do not govern the allowability of costs because allowability is a function of

the appropriate procurement or reviewing authority," *id.* at 27–28 (internal citation omitted). Thus, the government argues that there "is no dispute that the CAS control allocability but not allowability, and accordingly the CAS are irrelevant to this appeal." *Id.* at 30.

by the government efforts (which we discuss below) to amend the FAR to specifically deal with the allowability of costs such as those involved here.

### III

█ We turn then to the question whether these legal expenses are allowable. Boeing's conclusion that the costs are allowable rests on a fundamentally flawed assumption—that the only professional service costs that are not allowable under FAR § 31.205–33 are those costs that are specifically disallowed under another FAR provision.

Subpart 31.2 of the FAR pertains to cost principles and procedures governing "Contracts with Commercial Organizations." FAR § 31.201 outlines the general principles of the subpart. FAR § 31.201–2 explains that:

> [t]he factors to consider in determining whether a cost is allowable include the following: (1) reasonableness; (2) allocability; (3) standards promulgated by the CAS Board, if applicable; otherwise generally accepted accounting principles and practices appropriate to the particular circumstances; (4) terms of the contract; (5)[and] any limitations set forth in this subpart.

FAR § 31.204(c) explains how to apply the principles and procedures, and FAR § 31.205 contains over fifty subsections, each of which covers, in detail, the allowability of particular selected costs.

Although the FAR § 31.205 subsections covering selected costs are extensive, FAR § 31.204 makes clear that "[s]ection 31.205 does not cover every element of cost. Failure to include any item of cost does not imply that it is either allowable or unallowable." In such situations, FAR § 31.204(c) instructs us: *The determination of allowability shall be based on the*

*principles and standards in this subpart and the treatment of similar or related selected items.*" FAR § 31.204(c) (emphasis added). Although neither Boeing, its amicus, nor the government cites FAR § 31.204(c) in its briefs, the contracting officer relied on that provision here in disallowing the costs.

This court has not previously interpreted FAR § 31.204(c), but the Board has applied this regulation, or its predecessor in the Defense Acquisition Regulations [11] or the Armed Services Procurement Regulations,[12] on several occasions in the past. In *Stanford University,* ASBCA No. 28240, 85–3 BCA ¶ 18,446, 1985 WL 17055 (Sept. 24, 1985), Stanford sought to recover costs, including the cost of legal counsel, related to the issuance of a state tax-exempt bond, proceeds of which were used to finance the expansion of Stanford's computer facilities. The parties did not dispute the benefit of the expanded computer facilities to the government contract, but contested the allowability of the costs related to the bond issuance. The Board concluded that bond issuance costs were not specifically mentioned in the allowability regulations. The Board, however, noted that under the regulations in effect at the time, "failure to mention a particular item of cost in the standards is not intended to imply that it is either allowable or unallowable; rather, determination as to allowability in each case should be based on the treatment or standards provided for similar or related items of cost." *Id.* The Board held that the costs were unallowable because they were similar or related to "[i]nterest on borrowed capital," which was a cost specifically disallowed under the regulations, because "both bond issuance costs and interest are incurred to secure borrowed capital." *Id.* Other decisions of

---

**11.** DAR § 15–204(c) (1984).

**12.** ASPR § 15–204(c) (1976).

the Board have also applied FAR § 31.204(c) or one of its predecessors and found that costs were allowable because the costs were similar to costs allowed under other provisions. *See Gen. Dynamics Corp.,* ASBCA No. 31359, 92–1 BCA ¶ 24,698, 1992 WL 4538 (Jan. 6, 1992) (although the regulations did not explicitly cover allowability of costs associated with launching and rollout flights of a new aircraft, analyzing the allowability of those costs by considering whether they were similar to costs of advertising and sales promotion covered under DAR 15–205.1 or similar to costs of entertainment or lobbying covered under DAR 15–205.11); *Grumman Aerospace Corp.,* ASBCA No. 34665, 90–1 BCA ¶ 22,417, 1989 WL 222679 (Oct. 24, 1989) (holding that dividends paid to a contractor's employees on restricted stock were allowable, even though not explicitly covered by the regulations, because those costs were more similar or related to allowable cash compensation or stock bonuses than to unallowable distributions of profit), *vacated on other grounds,* 927 F.2d 575 (Fed.Cir.1991); *Boeing Co.,* ASBCA No. 24089 81–1 BCA ¶ 14,864, 1980 WL 2773 (Dec. 15, 1980) (holding the cost of stock appreciation rights ("SAR") were allowable because SARs were more similar or related to allowable cash or stock bonuses, than to unallowable stock options).

The principle announced in FAR § 31.204(c) supports the allowability holding of *Northrop.* As discussed above, in *Northrop* we addressed the question whether legal defense costs (in an action charging that the contractor wrongfully terminated several employees because the employees refused to participate in fraud against the United States) were allowable costs. Despite the existence of detailed regulations providing that professional service costs were allowable and that certain categories of legal expenses were not allowable, the regulations did not explicitly govern the allowability of the costs in the *Northrop* situation. The FAR, however, dealt with closely comparable categories of selected costs. Statutes and the FAR regulations broadly disallowed legal defense costs in suits brought by the federal and state governments "involv[ing] an allegation of fraud or similar misconduct" by the contractor. *See* FAR §§ 31.205–47(b)(2) and (b)(4).[13] The regulations also disallowed costs of unsuccessfully defending suits brought under certain federal anti-fraud laws by a private party. For example, FAR § 31.205–47(f)(4) disallowed legal costs for the "[d]efense of suits brought by employees or ex-employees of the contractor under section 2 of the Major Fraud Act of 1988 where the contractor was found liable...." And FAR § 31.205–47(c)(2)(1997) disallowed costs incurred when defending "any proceeding brought by a third party under the False Claims Act" in which the United States did not intervene, if the contractor was found liable.

Properly understood, *Northrop* and FAR § 31.205–47 taken together establish a simple principle—that the costs of unsuccessfully defending a private suit charging contractor wrongdoing are not allowable if the "similar" costs would be disallowed under the regulations. The present case is, however, distinguishable from the situation involved in *Northrop.* Here the costs of defending the *Citron* lawsuit would not be, as in *Northrop,* "similar" to disallowed costs. The regulations disallowing particular items of cost do not address costs similar to the costs of defending a contractor's directors from charges that they tolerated inadequate controls concerning possible fraud or similar misconduct.

---

**13.** *Northrop* involved the 1992 version of the FAR. The citations in this paragraph are to this version of the FAR, except where indicated.

However, we must also consider whether those costs are "related" to a category of disallowed costs, that is, costs of defending against government charges of contractor wrongdoing.[14]

We think it unlikely that the "related" test under FAR § 31.204(c) was designed to make a particular cost item unallowable simply because it would not have been incurred but for the occurrence of an event that resulted in a disallowed cost.[15] Under that theory, a contractor could not recover the cost of defending against lawsuits frivolously charging a lack of adequate controls over employee misconduct related to government contracts. The costs of defending corporate directors against frivolous lawsuits are essential to any business operation. In order for a cost to be "related," there must be a more direct relationship to the disallowed cost. Our predecessor court considered a similar issue in *Grumman Aerospace Corp. v. United States*, 217 Ct.Cl. 285, 579 F.2d 586, 596 (1978). Although that case did not directly construe the "similar or related" provision, that provision was codified at that time at ASPR § 15.201–4(c)(1976). ASPR § 15–205.31(d) disallowed legal costs relating to "prosecution of claims against the Govern-

ment." The government urged that that ASPR provision prohibited Grumman from recovering legal costs incurred in bringing a Freedom of Information Act ("FOIA") claim to gain access to information used by the Board in determining that Grumman had received excessive profits from the government in 1965 and 1966. The government's theory was that these costs related to the "prosecution of claims against the government." We rejected that theory. We held that ASPR § 15–205.31(d) did not prohibit the recovery of costs associated with such a FOIA suit because those costs bore "too tangential and speculative a relation to a contractor's demand in the . . . proceeding [to renegotiate the 1965 and 1966 profits]. . . ." *Grumman*, 579 F.2d at 597. However, we suggested that there may be "other types of injunctive suit[s that] are sufficiently related to a demand by [a] contractor for money so as to constitute a claim within the meaning of ASPR [§ ] 15–205.31(d). . . ." *Id.* at 596. The required direct relationship, we think, would exist here if there were a judicial determination that the Rockwell directors had failed to maintain adequate controls to prevent the occurrence of the wrongdoing against the government. But no such judi-

---

14. The costs of defending against the majority of the five charges of wrongdoing alleged in the *Citron* complaint here would be disallowed if Rockwell had sought to recover those costs from the government. As to the "second" and "third" items (*see ante* at 1277), 10 U.S.C. § 2324(e)(1)(C) disallows legal costs incurred in defense of a civil or criminal fraud charge brought by the United States where the contractor is found liable or pleads *nolo contendere* to the fraud charge. As to the "first", "second", "third", and "fifth" items above, FAR § 31.205–47(b) disallows legal costs related to any proceeding brought by a federal, state, local, or foreign government for violation of a law or regulation by the contractor, if the result of such a proceeding is: in a criminal proceeding, a conviction; in a civil or administrative proceeding, a finding

of contractor liability or the imposition of a monetary penalty; or if the proceeding was settled but could have led to one of those outcomes. The costs that are disallowed under FAR § 31.205–47 specifically include the "costs of legal services, whether performed by in-house or private counsel; . . . and any similar costs incurred . . . which bear[ ] a direct relationship to the proceedings." FAR § 31.205–47(a). Thus, statutes and regulations make clear that a contractor's legal costs incurred in the unsuccessful defense of four of the suits brought by the government here against Rockwell were not allowable.

15. Boeing concedes in its reply brief that "it is likely that Rockwell would not have been confronted with the *Citron* lawsuit had the federal investigations not occurred. . . ." Appellant's Reply Br. at 27.

cial determination has in fact been made. Rather the *Citron* suit was settled. We turn once again to the regulations for guidance as to the treatment of settlements.

The regulations reflect a policy judgment that where the action is brought by a federal or state government entity and the defense costs would be disallowed in an unsuccessful suit, the defense costs should also be disallowed in a settlement situation, *see* FAR § 31.205–47(b)(4), unless the U.S. government specifically agrees that they will be allowable, *see* FAR § 31.205–47(c). This policy judgment appears to be based on the assumption that suits brought by government entities are in most situations likely to be meritorious, thus justifying a bright line rule that does not look behind the settlement. Where a suit is brought by a private party and the suit is settled, however, such a blanket assumption is not appropriate. Unfortunately, the parties have not provided much help to us on how to distinguish between meritorious suits (for which costs should not be allowable) and suits that lacked merit (for which costs should be allowable), each taking an extreme position. Boeing

contends that only those costs incurred in a frivolous defense should be disallowed. The government on the other hand urges that we should apply a "but for" test, disallowing any costs that would not have been incurred "but for" misconduct by contractor employees. We find both positions unsatisfactory.

The regulations suggest that where a private suit is involved an inquiry is necessary to determine whether the plaintiff was likely to prevail.[16] This approach is most clearly reflected in the FAR regulations' treatment of settlements of private suits brought under the False Claims Act where the government does not intervene. FAR § 31.205–47(c)(2) (2000). Such costs may be allowable if the contracting officer determines that there was "very little likelihood that the third party [plaintiffs] would have been successful on the merits." *Id.*[17]

We think this is an appropriate standard for private suits in the present context. For the costs to be allowable in a settlement situation (where the costs of an unsuccessful defense would be disallowed), Boeing must show that the allegations in

---

**16.** We note that no such inquiry is required under FAR § 31.205–47(f)(4). That provision disallows a contractor's costs for the "[d]efense of suits brought by employees or ex-employees of the contractor under section 2 of the Major Fraud Act of 1988 where the contractor was found liable or settled" without a determination as to the likelihood of the success of the employee's claim. The Major Fraud Act only provides a cause of action for private parties who have acted "in furtherance of" a prosecution under the Act and are seeking a remedy for retaliation they have suffered because of their participation. Thus, a private party's cause of action under the Major Fraud Act is predicated on participation in a criminal prosecution that was initiated by the government against the contractor. No such direct nexus with a criminal prosecution is shown here.

**17.** FAR § 31.205–47(c)(2) did not exist in 1989, but was designed *"to clarify* the proper

interpretation of cost principle FAR § 31.205–47 as it relates to *qui tam* suits not joined in by the Government." 61 Fed.Reg. 31790 (June 20, 1996) (emphasis added). A suggestion that the new rule should not be applied retroactively, *see* Letter from Marcia G. Madsen, Chair Section of Public Contract Law, American Bar Association, to Mr. Jeremy Olson, General Services Administration and Ms. Sandra G. Haberlin, Defense Acquisition Regulations Council (Sept. 22, 1997), *available at* http://www.abanet.org/contract/federal/regscomm/quitam—001.html, was rejected by the DAR Council, *see* 63 Fed.Reg. 58,608 (Oct. 30, 1998). Thus, it is clear that FAR § 31.205–47(c)(2) applies retroactively and merely clarifies how the FAR principles, as they existed prior to 1998, applied to the allowability of costs related to the defense of *qui tam* suits brought under the False Claims Act.

the *Citron* action had "very little likelihood of success on the merits."

Boeing argues that in settlements the costs must be allowed because the Cost Principles Committee addressed and rejected a proposal to disallow such costs. Boeing points out that in 1988 the Cost Principles Committee proposed a provision (to be codified at FAR § 31.205–47(f)(5)) that would have disallowed costs incurred in connection with the "defense of lawsuits with third parties alleging improper activities related to Government contracting where the contractor was found liable or settled." Memorandum from Chairman, Cost Principles Committee, to the Director DAR Council (Nov. 29, 1988). This provision was never adopted. Boeing urges that because this provision would have specifically disallowed the costs here but was never enacted, such a limitation cannot be placed on the allowability of the costs under FAR § 31.205–33. This analysis is not correct. The Supreme Court has stated that "[a]s a general matter, we are reluctant to draw inferences from Congress' failure to act." *Brecht*, 507 U.S. at 632, 113 S.Ct. 1710; *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); *Am. Trucking Assns. v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416–18, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). The same holds for an agency's failure to enact a regulation. *See Fireside Nissan Inc. v. Fanning*, 30 F.3d 206, 212 (1st Cir.1994) (holding that an agency's intent cannot be determined from the agency's failure to adopt a regulation). Indeed, our decision in *Northrop* implicitly rejected Boeing's argument when it held Northrop's legal defense costs unallowable, even though those costs would have been covered by that portion of the unadopted regulation that would have disallowed legal defense costs where the contractor was found liable.

Boeing further argues that the terms of the *Citron* settlement agreement conclusively establish that the *Citron* plaintiffs had very little likelihood of success on the merits. Boeing urges, without citing any authority, that "indemnification of the director defendants under Delaware law was permissible only where the directors were found to have acted in good faith and in the corporation's best interests," Appellant's Br. at 22–23, and that the California court, by approving the settlement requiring indemnification of the defendants, "necessarily concluded that the allegations were without merit when it ordered Rockwell to indemnify its directors," *id.* at 26. In fact, in ordering indemnification to the "fullest extent permitted by the laws of the State of Delaware," the California court made no determination as to the allowability of fees under Delaware law. The pertinent Delaware law gives corporations the "*power* to indemnify" a director-defendant if the director acted in good faith, 8 Del. C. 145(a)(b) (emphasis added), and Rockwells by-laws required that Rockwell exercise this power. But there has been no judicial determination of good faith here, and Rockwells determination of good faith and subsequent indemnification is irrelevant. Thus, we cannot agree that the district court's approval of the settlement terms indicates that the *Citron* plaintiffs would have had very little likelihood of success on the merits because the defendants acted in good faith.[18]

### CONCLUSION

The Board committed legal error in determining the allowability of Rockwell's legal defense costs based on whether the costs conferred a "benefit [on] the Govern-

---

**18.** Even if there had been such a determination by the state court, we doubt that, as a matter of collateral estoppel, it would be binding against the government.

ment" and based on a "but for" standard that looked solely to the fact that admitted misconduct by Rockwell formed the basis for the complaint. We vacate the Board's decision and remand to the Board for further proceedings consistent with this opinion. On remand, the Board may allow the costs only if it determines that the plaintiffs in the *Citron* lawsuit had "very little likelihood of success on the merits" of prevailing.

*VACATED AND REMANDED COSTS.*

COST

No costs.