**FLUOR HANFORD, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

Nos. 02–759C, 03–1287C.

United States Court of Federal Claims.

July 1, 2005.

Agnes P. Dover, Hogan & Hartson, L.L.P., Washington, DC, for plaintiff.

Matthew P. Reed, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

HODGES, Judge.

Fluor Hanford alleges that the Department of Energy breached its contract by refusing to reimburse legal costs and expenses that plaintiff incurred defending a *qui tam* action. The issue is whether plaintiff should be reimbursed for its legal expenses or limited to a lesser amount. The Government does not dispute that it owes Fluor a portion of the cost, perhaps eighty percent. The parties filed cross-motions for partial summary judgment on the amount to which Fluor is entitled.

This case is controlled by an opinion of the Court of Appeals for the Federal Circuit on a related issue. *See Boeing N. Am., Inc. v. Roche,* 298 F.3d 1274 (Fed.Cir.2002). We must grant defendant's motion to cap plaintiff's reimbursement at eighty percent.

## BACKGROUND

The United States Department of Energy owns a facility for production of nuclear materials in southeast Washington State. The Hanford facility was operated by Westinghouse Hanford Corporation until the mid–

1990's. DOE requested proposals for a new manager for the site in 1996 and awarded the contract to Fluor in August of that year. Fluor undertook management responsibilities for the Hanford site in October 1996.[1]

Plaintiff's agreement with the Department of Energy was primarily a cost-type contract under which DOE agreed to reimburse Fluor for all its allowable costs, including legal costs. *See* Clause H.38—"Insurance-litigation and claims."[2] The contract also required the Government to reimburse Fluor for liabilities arising from all pre-existing conditions at the Hanford site.

An employee named David Carbaugh filed a *qui tam* action against Westinghouse Hanford Corporation when it was still operating the Facility.[3] The primary basis of Mr. Carbaugh's suit was the company's use of a financial data system at the Hanford facility that allegedly overcharged the Government for certain personnel costs. The Transfer Agreement between Fluor and Westinghouse required Fluor to retain a portion of the existing workforce, including Mr. Carbaugh. Fluor was responsible for a payroll that was due just days after Fluor began operations at the Hanford site. The accelerated transition schedule made it necessary for Fluor to continue using the same financial data system after it took over in October 1996.

Fluor eliminated 150 positions from its workforce at the Hanford site in January 1997. Mr. Carbaugh's was one of the jobs eliminated. Mr. Carbaugh amended his *qui tam* complaint to add Fluor as a defendant following his dismissal in March 1997. The amended complaint included essentially the same allegations against Fluor as Mr. Carbaugh had asserted against Westinghouse. Later he added state employment law claims related to his termination.

The Justice Department reviewed Mr. Carbaugh's *qui tam* action and declined to prosecute the claims against Fluor. A district court unsealed the *qui tam* complaint and ordered that it be served on Fluor in April 1998. The court granted Fluor's motions for summary judgment on some of Carbaugh's claims and dismissed other claims. The parties agreed to settle the state employment law claims for $450,000 in January 2002. Fluor submitted a claim to the Government for reimbursement of approximately $1.42 million in April 2001 for legal expenses it incurred defending the *qui tam* action. It submitted a second claim for approximately $1.99 million for legal costs accruing thereafter, until the lawsuit was dismissed with prejudice in 2002.

Broad indemnity clauses such as those included in the August 1996 contract as Clause H.3 are typical of management contracts of this type. *See, e.g., Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242, 1245 (Fed.Cir. 2003) ("Because of the inherent danger in manufacturing nuclear weapons components, the [Management and Operation] contracts required the government to assume 'virtually all operational and financial risks' in performing the contracts.") (citation omitted). Clause H.3 of plaintiff's August 1996 contract with the Government provides that:

> The DOE agrees to reimburse [Fluor] ... for any liability ... and any civil fine or penalty, expense, or remediation cost, but limited to those of a civil nature, which may be incurred by, imposed on, or asserted against the Contractor arising out of any condition, act, or failure to act that occurred before the Contractor assumed responsibility on October 1, 1996.

Contract Clause H.3—Pre–Existing Conditions. Though the *qui tam* action against Fluor was such a liability, having arisen "before the Contractor assumed responsibility on October 1, 1996," the Government refused

---

1. Fluor's management contract is subject to 48 C.F.R. Part 31 of the Federal Acquisition Regulations pertaining to contract cost principles and procedures. FAR section 31.205–47 addresses costs related to legal proceedings.

2. A modification of the contract dated September 30, 1996 added Clause H.56, which made allowable costs "including those incurred by reason of any claim, cost (including attorneys' fees, media-

tion, arbitration or resolution and defense costs), demand, charge, expense, fine, penalty, [or] settlement ...."

3. A *qui tam* suit is an action authorized by the False Claims Act whereby a private citizen, called a "relator," sues in the name of the United States. *See* 31 U.S.C. § 3730(b).

to reimburse plaintiff its legal costs. The Contracting Officer agreed to reimburse only eighty percent of Fluor's reasonable costs of defending the *qui tam* action. She partly denied Fluor's $1.99 million second claim, allowing reimbursement of only $1.72 million.[4] The Government has not paid Fluor for the claim that it submitted to DOE in April 2001.

## DISCUSSION

Summary judgment is appropriate when the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties do not dispute genuine issues of material fact. Issues of statutory interpretation are matters of law that may be decided on motions for summary judgment. *Santa Fe Pac. R.R. Co. v. United States*, 294 F.3d 1336, 1340 (Fed.Cir.2002).

The contracting officer's justification for withholding full reimbursement of plaintiff's costs of defense is a FAR provision that was issued pursuant to the Major Fraud Act of 1988, 10 U.S.C. § 2324, 41 U.S.C. § 256; 48 C.F.R. § 31.205–47(b). The Major Fraud Act disallows certain costs incurred by a contractor in connection with a proceeding commenced by the United States. Its purpose is to prevent the Government from financing both sides of a lawsuit. *See* 10 U.S.C. § 2324(k); 41 U.S.C. § 256(k). Fluor's right to full reimbursement of its legal costs of defending the *qui tam* action in dispute depends on the interpretation of the Major Fraud Act, the applicability of a 1998 amendment to Federal Acquisition Regulations promulgated pursuant to that Act, and

a ruling by the *Federal Circuit Court of Appeals in Boeing North American, Inc. v. Roche*, 298 F.3d 1274 (Fed.Cir.2002).

### A. The Major Fraud Act

▮ Passage of the Major Fraud Act reflected the desire of Congress to avoid paying for a contractor's defense when the Government was also prosecuting the case. *See* 134 *Cong. Rec.* S16697–01 (daily ed. Oct. 18, 1988) (statement of Sen. Grassley, noting that statute's purpose is to avoid requiring taxpayers to pay for both sides of a legal dispute). The Major Fraud Act did not mention *qui tam* suits, but limited recovery for litigation costs to eighty percent in actions "commenced by the United States." 41 U.S.C. § 256.[5] The Government urges us to apply the statute's limitations on reimbursement of costs in all cases in which a *qui tam* relator brings a lawsuit under the False Claims Act. The Government asserts that the language "commenced by the United States" in the Major Fraud Act means the same as "in the name of the United States" as used in the False Claims Act. *Compare* 31 U.S.C. § 3730 *with* 48 C.F.R. § 31.205–47(b).

A court must look at the plain language of a statute to interpret its meaning. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Where the language of a statute is plain and unambiguous, the only role for the court is " 'to enforce [the statute] according to its terms.' " *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). The Major Fraud Act does not define the term "commence," or state what constitutes an action "commenced by the United States." The dictionary meaning of the word, howev-

---

4. The Government also reimbursed Fluor for $200,000 of $450,000 that it claimed in settlement costs, an amount that the Contracting Officer deemed reasonable. This issue is beyond the scope of this Opinion.

5. (A) ... [C]osts incurred by a contractor in connection with a criminal, civil, or administrative proceeding *commenced by the United States* ... in connection with a covered contract may be allowed as reimbursable costs under the contract if such costs are not disal-

lowable under paragraph (1), but only to the extent provided in subparagraph (B).

(B)(i) The amount of the costs allowable under subparagraph (A) in any case may not exceed the amount equal to *80 percent* of the amount of the costs incurred, to the extent that such costs are determined to be otherwise allowable and allocable under the Federal Acquisition Regulation.

41 U.S.C. § 256(k)(5) (emphases added).

er, is the same as the common understanding among most people. That is, "commence" means to begin, to start, or to originate. *See, e.g., Webster's New World Dictionary* 230 (10th ed.1993). The Major Fraud Act limits the recovery of legal expenses to eighty percent in actions that are begun, started, or originated by the Government against the contractor.

Defendant argues that a *qui tam* action is commenced by the United States within the meaning of the Major Fraud Act even where the Government chooses not to intervene, because in *qui tam* proceedings the United States is the real party in interest.[6] It directs us to a Fourth Circuit case for support, *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center,* 961 F.2d 46 (4th Cir.1992). That case held that a state university did not qualify for Eleventh Amendment immunity from a *qui tam* lawsuit because the United States was the real party in interest even though the Government did not intervene.[7] *Id.* at 50.

The Government also cites a Second Circuit case, *Minotti v. Lensink,* 895 F.2d 100 (2d Cir.1990). The *Minotti* court too found that the United States is the real party in interest in *qui tam* actions. *Id.* at 104. Whether the United States is the real party in interest does not resolve the question whether the *qui tam* suit was "commenced by the United States," however. The Second Circuit observed in *Minotti* that "*qui tam* actions allow individual citizens to initiate enforcement against wrongdoers" purportedly defrauding the Government. *Id.*

Defendant argues that the Government gets most of the award in a *qui tam* action regardless of intervention; that the Government may intervene at any point for good cause, or may settle the case over the objection of the relator; and that the Government must consent to any settlement. *See* 31 U.S.C. § 3730. The United States' potential to control the litigation does not mean that the suit was "commenced by the United States," and it does not render the relator less a party. *United States ex rel. Long v. SCS Bus. & Technical Inst., Inc.,* 173 F.3d 870, 884 n. 16 (D.C.Cir.1999).

*Qui tam* suits are brought in the names of the relator *and* the United States, according to the Fifth Circuit. *United States ex rel. Foulds v. Tex. Tech Univ.,* 171 F.3d 279, 289 (5th Cir.1999). That court stated, "it is plain as the sun that this [*qui tam* action] was not commenced by the United States ....... It is true however, that [the relator], pursuant to statutory authority, has brought this suit in the name of and on behalf of the United States ...." *Id.*

Congress established *qui tam* procedures to encourage private citizens to come forward when they know of fraudulent claims against the United States. Those citizens act on behalf of themselves, in the name of the United States. 31 U.S.C. § 3730(b); *Ex rel. Foulds,* 171 F.3d at 289; *Minotti,* 895 F.2d at 104 (noting that *qui tam* actions "allow *individual citizens* to initiate enforcement against wrongdoers") (emphasis added). The legislative history of the Major Fraud Act is consistent with the statute's plain meaning. *See GTE Sylvania,* 447 U.S. at 108, 100 S.Ct. 2051 (holding that statutory language is conclusive in absence of "clearly expressed legislative intention to the contrary ....").

Congress' purpose in passing the Major Fraud Act was to protect taxpayers from financing both sides of a lawsuit.[8] If the

---

6. The False Claims Act gives the Government the option to intervene within sixty days of a *qui tam* relator's filing of the lawsuit. 31 U.S.C. § 3730(b)(2).

7. The Eleventh Amendment to the Constitution limits certain lawsuits against the States in federal courts: "The Judicial power of the United States shall not be construed to extend to any suit ... commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens ... of any Foreign State." *U.S. Const.* amend. XI.

8. Senator Grassley sponsored the section of the Major Fraud Act at issue here. He explained that Congress sought to avoid "[t]he anomalous result ... [of] the same Government that prosecutes the fraud case pay[ing] the cost of defense. We as taxpayers pay twice—we fund the prosecution ... through the Agency's budgets; then we subsidize the contractor and their high priced lawyers." 134 *Cong. Rec.* S16697–01 (daily ed. Oct. 18, 1988).

Government chooses not to intervene in a *qui tam* action, the purpose of the provision is not implicated; taxpayers do not pay for both the prosecution and the defense. If the Government does not intervene, the *qui tam* plaintiff funds the prosecution of the lawsuit and cannot seek reimbursement from the Government for these costs. The Government does not prevent the *qui tam* plaintiff from continuing the lawsuit by declining to intervene, but it avoids all financial responsibility for prosecuting the matter.

### B. The FAR Regulations

■ Part 31 of the Code of Federal Regulations defines costs related to legal and other proceedings that may be reimbursable according to cost accounting standards. The current version of section 31.205–47(e) addresses circumstances in which costs that fall under the Major Fraud Act and are not made *un*allowable by the Act, may be allowable if:

> (1) The costs are reasonable in relation to the activities required to deal with the proceeding and the underlying cause of action;
>
> (2) The costs are not otherwise recovered from the Federal Government or a third party, either directly as a result of the proceeding or otherwise; and
>
> (3) The percentage of costs allowed does not exceed the percentage determined to be appropriate considering the complexity of procurement litigation, generally accepted principles governing the award of legal fees in civil actions involving the United States as a party, and such other factors as may be appropriate. Such percentage *shall not exceed 80 percent*. . . .

48 C.F.R. § 31.205–47(e) (emphasis added). Thus, FAR restricts reimbursement to eighty percent of legal costs incurred in connection with a criminal, civil, or administrative proceeding "commenced by the United States" if the costs are otherwise reimbursable, as here.

Fluor argues that it is entitled to full reimbursement of its incurred costs of defending the Carbaugh litigation because FAR regulations applicable at the time of entering its contract with DOE so provided. *See* FAR 31.205–47(b). The Contracting Officer's deci-

sion denying reimbursement to Fluor relied on the 1998 amendments pertaining to *qui tam* defense costs. *See* FAR 31.205–47— Costs related to legal and other proceedings. Her decision denying full reimbursement was based on a principle that did not take effect until more than two years after performance of Fluor's contract began.

Retroactivity is generally disfavored. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Amendments may have retroactive applications only if they can be viewed as "clarifications" rather than substantive changes of an existing cost principle. The Government contends that the regulations promulgated as parts of the Final Rule in 1998 were essentially the same regulations that were in effect when the parties entered the contract in 1996. The express mention of *qui tam* suits in the 1998 Final Rule was merely a clarification of the existing rule, defendant argues, and not a new rule. If the Rule were a new rule or an amended rule as plaintiff contends, it would not apply to Fluor's prior existing contract with the Department of Energy. *See, e.g., Johnson v. All–State Constr., Inc.*, 329 F.3d 848, 851 n. 2 (Fed.Cir.2003).

*Qui tam* suits have not always been considered actions "commenced by the Government." The FAR provision promulgated pursuant to the Major Fraud Act initially did not include *qui tam* suits. The Defense Contract Audit Agency published Audit Guidance for its Regional Directors in 1994 for costs incurred by contractors defending *qui tam* suits. DCAA ruled that such costs were 100% recoverable where the Government chose not to intervene because *qui tam* suits were not commenced by the Government within the meaning of the Major Fraud Act. *See* DCAA Memorandum for Regional Directors, Defense Costs for Private False Claims (June 20, 1994). The DCAA Memorandum stated in part that

> [t]he prevailing view among the circuit courts that have ruled on the constitutionality of the qui tam law is that the qui tam provisions constitute a limited assignment of the Government's claim against the con-

tract to the qui tam relator. Because the relator has received a limited assignment of the Government's claim, the relator files a qui tam suit against the contractor for him or herself and for the benefit of the Government. However, the [*qui tam* ] suit is not brought by the Government. Thus, the costs do not fall within FAR 31.205–47(b).

FAR provision 31.205–47(b) was applicable in such circumstances, and all costs incurred by the contractor for defense of *qui tam* actions were recoverable. *Id.* The DCAA noted that the *qui tam* suit would become a suit "brought by the Government" if and when the Government intervened in the relator's suit. *Id.* The DCAA reversed its position the following year and announced without explanation that costs incurred defending against *qui tam* suits should be limited to eighty percent even when the Government does not intervene. *See* DCAA Memorandum (August 24, 1995).

The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council proposed a rule in June 1996 addressing the allowability of costs incurred in defending *qui tam* suits when the Government decides not to intervene. 61 Fed.Reg. 31,790 (June 20, 1996). The new rule proposed amendments to FAR 31.205–47(b), (c), and (e)(4) that would place an eighty percent cap on reimbursement for such suits. *Id.* The FAR Council issued a Final Rule in October 1998 and deemed it a "clarification" of FAR 31.205–47 as it relates to *qui tam* suits that the Government does not join. 63 Fed.Reg. 58,599, 58,608 (Oct. 30, 1998).

The Final Rule stated that contractors would be reimbursed under FAR 31.205–47(e)(3) for a maximum of eighty percent of the legal costs incurred in defending against all *qui tam* actions, assuming that such costs otherwise are allowable, irrespective of whether the Government intervenes.[9] The Final Rule amended FAR 31.205–47, "Costs related to legal and other proceedings," "to clarify the allowability of costs incurred for qui tam suits in which the Government does not intervene." *Id.* The FAR amendment was enacted after plaintiff entered its contract with the Government in 1996. The contract incorporated the then-current version of FAR 31.205–47 expressly: "The contracting officer and the contractor shall agree [on] ... payment for allowable costs[ ] in accordance with Subpart 31.2 ... in effect on the date of this contract."

The Government contends that the express mention of *qui tam* suits in the 1998 Final Rule was merely an amendment that made more clear what the law had always been. The Federal Circuit agreed that the 1998 amendment to the FAR provision that controls this case is a clarifying amendment and therefore retroactive to the time of plaintiff's contract. *Boeing*, 298 F.3d at 1288 n. 17. The court explained that although

> FAR .§ 31.205–47(c)(2) did not exist in 1989, [it] was designed "to clarify the proper interpretation of cost principle FAR § 31.205–47 as it relates to *qui tam* suits not joined in by the Government." 61 Fed.Reg. § 31,790 (June 20, 1996). ... *Thus, it is clear that FAR § 31.205–47(c)(2) applies retroactively* and merely clarifies how the FAR principles, as they

---

9. The FAR had not previously addressed circumstances in which third parties filed actions *in the name* of the United States, as in the case of a *qui tam* suit. The 1998 change added language subjecting *qui tam* suits to the reimbursement cap even if the Government does not intervene. The language added to various sections of FAR 31.205–47 by the 1998 amendment is highlighted below:

> (b) Costs incurred in connection with any proceeding brought by a Federal, State, local, or foreign government for violation of, or a failure to comply with, law or regulation by the contractor (including its agents or employees), *or costs incurred in connection with any proceeding brought by a third party in the name of*

*the United States under the False Claims Act, 31 U.S.C. 3730,* are unallowable ....

> .         .         .         .         .

> (e) Costs incurred in connection with proceedings described in paragraph (b) of this subsection, but which are not made unallowable by that paragraph, may be allowable to the extent that:

> .         .         .         .         .

> (3) The percentage of costs allowed does not exceed the percentage determined to be appropriate considering the complexity of procurement litigation ... and such other factors as may be appropriate. *Such percentage shall not exceed 80 percent.*

48 C.F.R. § 31.205–47 (emphases added).

existed prior to 1998, applied to the allowability of costs related to the defense of qui tam suits brought under the False Claims Act.

*Id.* (emphasis added).

## C. The *Boeing* Decision

The Federal Circuit has ruled on the section of FAR that includes the provision at issue in this case. *See Boeing N. Am., Inc. v. Roche,* 298 F.3d 1274 (Fed.Cir.2002) (interpreting FAR section 31.205–47(c)(2)); *see generally* FAR 31.205–47. That case interpreted a FAR section that controls the treatment of an agreement to settle fraud-related claims in a derivative suit. FAR 31.205–47(c)(2).

The Federal Circuit in *Boeing* noted that legal costs incurred by the contractor defending a shareholder's derivative suit was subject to the provisions of the same 1998 Final Rule at issue in this case. 298 F.3d at 1288 n. 17. The court held that the Final Rule applied, though "FAR § 31.205–47(c)(2) did not exist in 1989 [when the suit was filed] ...." *Id.* The court added, "it is clear that FAR § 31.205–47(c)(2) applies retroactively and merely clarifies how the FAR principles, as they existed prior to 1998, applied to the allowability of costs related to the defense of *qui tam* suits brought under the False Claims Act." *Id.*

Shareholders in *Boeing* brought a derivative action against fourteen directors of Boeing's predecessor-in-interest, Rockwell International, and many "other members of management and employees ...." *Boeing,* 298 F.3d at 1276–77. Rockwell settled with the shareholders by agreeing to pay their attorneys' fees and making various changes in corporate procedures. A district court approved the settlement and dismissed the complaint on the merits. Rockwell indemnified its directors from expenses and legal fees as permitted under Delaware law. *Id.* at 1278.

Rockwell's total legal fees and costs for 1989–1991 was approximately $4.5 million, including the cost of indemnifying the directors. "Rockwell included these costs as general and administrative ... costs in its home office overhead for fiscal years 1989, 1990, and 1991, and it claimed reimbursement for a portion of the costs under its various contracts with the government." *Id.* The contracting officer disallowed the costs pursuant to FAR 31.205–15. That section provides that "[c]osts of fines and penalties resulting from violations of, or failure of the contractor to comply with, Federal, State, local, or foreign laws and regulations, are unallowable except when incurred as a result of compliance with specific terms and conditions of the contract or written instructions from the contracting officer." FAR 31.205–15(a).

The Armed Services Board of Contract Appeals denied Boeing's appeal from the contracting officer's final decision based on a ruling that the Federal Circuit Court of Appeals had issued in a similar case involving "allowable costs" under FAR 31.201–4. *See Caldera v. Northrop Worldwide Aircraft Servs., Inc.,* 192 F.3d 962 (Fed.Cir.1999) (finding costs unallowable because the Government did not benefit from Northrop's defense of a wrongful termination action involving fraud against the United States). The *Boeing* court reviewed the standards by which a contractor's costs of legal defense may be allocable and allowable pursuant to applicable cost accounting standards. *See* 298 F.3d at 1280; 4 C.F.R. Parts 9903, 9904.

The court conducted a detailed analysis of applicable cost accounting standards and FAR provisions, and concluded that it was not necessary for a cost to "benefit the government's interests" directly to be allocable. 298 F.3d at 1284. The Federal Circuit added, "in a settlement situation (where the costs of an unsuccessful defense would be disallowed), Boeing must show that the allegations in [the derivative action] had 'very little likelihood of success on the merits' " to be allowable. *Id.* at 1288–1289. The court remanded the case to the Armed Services Board of Contract Appeals to decide whether the shareholders' derivative action would have had "very little likelihood of success on the merits." *Id.* at 1290.

The Federal Circuit emphasized that the FAR Council had rejected suggestions from the American Bar Association and others

that the 1998 rule should not have retroactive effect. *Id.* at 1288 n. 17.

A suggestion that the new rule should not be applied retroactively ... was rejected by the DAR Council .... *Thus, it is clear that FAR § 31.205–47(c)(2) applies retroactively and merely clarifies how the FAR principles, as they existed prior to 1998, applied to the allowability of costs related to the defense of qui tam suits brought under the False Claims Act.*

*Id.* (citations omitted) (emphasis added). The FAR Council did not explain its rationale for declining the recommendations of the ABA and others, in the Federal Register or elsewhere so far as we know.[10]

Plaintiff characterizes the Federal Circuit's rulings in *Boeing* as "dicta." The Circuit's opinion did not analyze the FAR sections that we must apply in this case, or address a situation in which the parties' responsibilities were controlled by an indemnity contract. Fluor had negotiated the indemnity to protect it from the very concern that arose in this case—having to defend a lawsuit of which it had no knowledge when the contract was signed.[11]

The Federal Circuit applied section 31.205–47(c)(2) to a settlement agreement in a shareholder's derivative suit.[12] It remanded the case for the contracting officer to make a determination whether the suit would have been successful on the merits if it had not been settled. The suit for which Fluor seeks reimbursement was not a derivative action and it did not end in settlement. It was a *qui tam* suit that was dismissed on the merits by a district court, with prejudice. The court could hardly have been more clear in its ruling on the determinative issue in this case, however—the characterization of the Final Rule as a clarification and its resulting retrospective effect. If the Federal Circuit considers its footnote to be dicta, or a ruling that is limited in any event to settlements of derivative actions against contractors, that is the proper court to make such a determination.

## CONCLUSION

The Major Fraud Act applies to costs that arise from proceedings "commenced by the United States." Congress' concern that the Government would find itself on both sides of a dispute relating to allegations of contractor fraud do not come into play where the Government does not join the lawsuit and has no financial responsibility for it. The FAR Council added the eighty percent cap on reimbursement of contractor expenses to a proceeding that Congress did not authorize or even address in the Major Fraud Act. The FAR did not mention *qui tam* suits either, until the 1996 proposed Rule and the 1998 Final Rule adding a cap on the cost of defending them.[13] Such an extension of the Major Fraud Act by regulation reasonably could be considered more than a clarification, as the issue presented itself in this case. If so, the FAR Council also made substantive changes in Fluor's contract with the Department of Energy by imposing an eighty per-

10. *See* 63 Fed.Reg. 58,599, 58,600 (October 30, 1998): "Industry has commented that this coverage should be effective prospectively. After consideration of these comments, it is concluded that this coverage is properly characterized as a clarification."

11. DOE promised to reimburse Fluor "for any liability ... and ... expense ... which may be incurred by, imposed on, or asserted against [Fluor] arising out of any condition, act, or failure to act that occurred before the Contractor assumed responsibility on October 1, 1996." Contract Clause H.3—Pre–Existing Conditions.

12. That section provides, "[i]n the event of a settlement of any proceeding brought by a third party under the False Claims Act in which the United States did not intervene, reasonable costs incurred by the contractor in connection with such a proceeding, that are not otherwise unallowable by regulation or by separate agreement with the United States, may be allowed if the contracting officer, in consultation with his or her legal advisor, determines that there was very little likelihood that the third party would have been successful on the merits." § 31.205–47(c)(2).

13. The applicable FAR provision that existed when the parties entered this contract applied only to the cost of proceedings *"brought by* a Federal, State, local, or foreign Government ...." FAR 31.205–47(b) (emphasis added). The same section of the 1998 Final Rule adds coverage to "costs incurred in connection with any proceeding brought by a third party *in the name* of the United States ...." *Id.* (emphasis added).

cent cap when the parties agreed to full indemnity for pre-existing claims.

The Government argued that plaintiff should have read the Federal Register and been aware that the FAR Council was considering clarifying the "confusion" that had arisen regarding actions in which the United States had declined to intervene. This would be the confusion that arose because of opinions of the DCAA that such actions were or were not limited by the Major Fraud Act or its implementing regulations. The 1998 Final Rule attempted to deal with this confusion by its amendment to FAR 31.205–47:

> [C]ertain Government contracting personnel and contractors may have had common misinterpretations of the language at FAR 31.205–47 prior to August 24, 1995. For qui tam legal fees incurred before August 24, 1995, if the Government contracting personnel and the contractor shared a common misinterpretation of the language at FAR 31.205–47, the contracting officer, in consultation with his or her legal advisors, should determine the appropriate treatment of those costs on a case-by-case basis.

Plaintiff's contract was formed in 1996, so it cannot take advantage of the FAR exception that arose from the confusion engendered by the conflicting 1994 and 1995 DCAA rulings that prompted it.

Defendant's motion for partial summary judgment is GRANTED. Plaintiff's motion for partial summary judgment is DENIED. The parties will contact the court no later than July 11 to discuss the effect of this ruling and how they propose to proceed with remaining issues, if necessary.