# United States Court of Appeals for the Federal Circuit

2008-1543


Robert M. Gates, SECRETARY OF DEFENSE,

Appellant,

v.

RAYTHEON COMPANY,

Appellee.


    <u>C. Coleman Bird</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellant.  With him on the brief were <u>Jeanne E. Davidson</u>, Director, and <u>Kirk T. Manhardt</u>, Assistant Director.

    <u>Karen L. Manos</u>, Gibson, Dunn & Crutcher LLP, of Washington, DC, argued for appellee.  With her on the brief were <u>Christyne K. Brennan</u> and <u>Dace A. Caldwell</u>.

Appealed from:  Armed Services Board of Contract Appeals

Administrative Judge Jack Delman

# United States Court of Appeals for the Federal Circuit

2008-1543

Robert M. Gates, SECRETARY OF DEFENSE,

Appellant,

v.

RAYTHEON COMPANY,

Appellee.

Appeal from the Armed Services Board of Contract Appeals in no. 54907, Administrative Judge Jack Delman.

_____

DECIDED: September 14, 2009

_____

Before MAYER, LOURIE, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

The issue before the court is whether Raytheon Co. was required to pay interest to the Government for a potential violation of Cost Accounting Standard 413 ("CAS 413"), 48 C.F.R. § 9904.413. The Government appeals from a decision of the Armed Services Board of Contract Appeals ("Board"), which held on summary judgment that Raytheon's potential violation of CAS 413 had not caused the Government to pay increased costs and therefore did not require Raytheon to pay interest on certain money it owed the Government. Because Raytheon's failure to pay the Government in the accounting period required by CAS 413 necessarily resulted in increased costs to the Government, we reverse and remand.

BACKGROUND

This appeal relates to certain contracts between Raytheon and the Government.[1] These contracts are subject to certain Cost Accounting Standards ("CAS"), which provide uniformity in how contractors measure, assign, and allocate costs to Government contracts.[2] See 48 C.F.R. § 9901.302(b). If the contractor does not follow the relevant CAS and consequently overcharges the Government, the contract price must be adjusted. To implement these adjustments, contracts subject to the CAS include a clause that provides:

> [T]he Contractor, in connection with this contract, shall . . . (5) [a]gree to an adjustment of the contract price or cost allowance, as appropriate, if the Contractor . . . fails to comply with an applicable Cost Accounting Standard . . . and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States, together with interest thereon computed at the annual rate established under section 6621 of the Internal Revenue Code of 1986 (26 U.S.C. 6621) for such period, from the time the payment by the United States was made to the time the adjustment is effected. . . .

48 C.F.R. § 52.230-2(a) (the "CAS clause").

One type of cost that was allocable to the contracts at issue related to Raytheon's defined-benefit pension plans for its employees. See 48 C.F.R. § 9904.412-

---

[1] As explained by the Board, the parties selected Contract No. DAAH01-96-C-0114, an open, CAS-covered contract between Raytheon and the Government, as a "test" contract for purposes of establishing Board jurisdiction. The parties stipulate that the following clauses are included in that contract: FAR 52.230-2, Cost Accounting Standards (Aug. 1992); FAR 52.230-5, Administration of Cost Accounting Standards (Feb. 1995); and FAR 52.232-17, Interest (Jan. 1991).

[2] The CAS were promulgated by the CAS Board pursuant to its statutory authority under 41 U.S.C. § 422(f), (h). The CAS provisions can be found in the Code of Federal Regulations. CAS xyz corresponds to 48 C.F.R. § 9904.xyz.

40(d); 48 C.F.R. § 9904.413-40(c). Defined-benefit plans guarantee fixed payments to retired employees, leaving the company responsible for ensuring that sufficient funds will be available. Companies therefore must make assumptions regarding, inter alia, the amount of money they expect to pay in the future, and the expected performance of the investments held by their pension plans. Based on these assumptions, companies determine how much money to invest in the plan in a given period so that future liabilities will be met. Because these contributions to the pension fund are part of the cost of doing business with the contractor, in the case of cost-type contracts they are paid, in part, by the Government. 48 C.F.R. § 31.205-6(j); see also Allegheny Teledyne, Inc. v. United States, 316 F.3d 1366, 1370 (Fed. Cir. 2003).

The CAS provide rules for the appropriate determination of pension costs allocable to a particular business segment and to individual contracts within that segment. See 48 C.F.R. § 9904.412-40(d); 48 C.F.R. § 9904.413-40(c).[3] The CAS also provide that when a business segment is closed,[4] the contractor must calculate both the market value of the assets in the pension plan allocated to the segment and the actuarial accrued liability for the segment. 48 C.F.R. § 9904.413-50(c)(12). The difference between the plan's assets and liabilities indicates the amount by which the

---

[3]     Allowability, in contrast, is determined by the relevant provisions of the FAR and the contract itself. See Boeing N. Am., Inc. v. Roche, 298 F.3d 1274, 1280 (Fed. Cir. 2002).

[4]     A "segment closing" occurs when "a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard." 48 C.F.R. § 9904.413-30(a)(20).

plan is over- or under-funded.[5] CAS 413-50(c)(12)(vi) provides a method for calculating the Government's "share" of this difference, and subsection (vii) provides that the "full amount of the Government's share of an adjustment is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly." CAS 413-50(c)(12)(vii). Thus, if the plan is overfunded, the contractor will owe the Government money in the form of a price adjustment, referred to as a "segment closing adjustment."

Here, Raytheon sold two of its business segments that had performed work on CAS-covered Government contracts. In 1998, Raytheon sold Montek Aerospace to Moog Inc., but retained all of the pension assets and actuarial liabilities. It is undisputed that this constituted a segment closing. Approximately two years later, Raytheon informed the Government that it had calculated a pension surplus as of the date of the segment closing. The contracting officer asked Raytheon to calculate the Government's share of the surplus (i.e., the segment closing adjustment). After several years of calculations, re-calculations, and disputes, Raytheon eventually agreed that the Government's share was $487,305. On August 30, 2004, the Government then requested that Raytheon pay the adjustment. Because CAS 413-50(c)(12)(vii) refers to an adjustment in the period of the segment closing, the Government viewed the debt as due in 1998, and therefore also demanded simple interest on the amount due dating back to the initial segment closing. On September 21, 2004, Raytheon submitted a check for the segment closing adjustment, but refused to pay interest.

---

[5] This difference typically occurs because the assumptions regarding expected investment performance and anticipated liabilities made at the time of contribution do not match actual investment performance precisely.

In 2000, Raytheon sold Raytheon Engineers and Constructors ("REC") to Washington Group International, but retained the pension assets and liabilities. This sale also constituted a segment closing. Raytheon informed the Government that there was a pension surplus, and calculated the Government's share at $4,935,197. The parties disputed the appropriate amount of this share for some time, and eventually settled on a Government share of $14,681,268. On August 31, 2004, the Government requested payment of the calculated adjustment, as well as simple interest on that amount dating back to the segment closing. On September 21, 2004, Raytheon submitted a check for the segment closing adjustment, but refused to pay interest.

The dispute here stems from Raytheon's failure to pay interest on the amounts owed under CAS 413-50(c)(12) for the period between the segment closing and the date of payment. The contracting officer issued a decision, finding that Raytheon had not complied with CAS 413-50(c)(12) with respect to either sale, and therefore owed interest to compensate for the delay.

Raytheon appealed to the Board, which initially granted summary judgment to the Government. Raytheon Co., ASBCA No. 54907, 07-2 BCA ¶ 33,655 (Aug. 21, 2007) ("Original Decision"). In its Original Decision, the Board held that CAS 413 requires a current period adjustment (i.e., a payment or credit in the period of the segment closing) and that Raytheon had failed to timely make the adjustments. Id. at 18. It also held that "where there is a pension surplus, it follows that unless and until appellant timely provides this current period adjustment to the government as a credit or otherwise as required by CAS 413, the government has paid increased costs." Id. Thus, the Board found that Raytheon's "CAS non-compliance, i.e., its failure to timely

'settle up' with the government as required by CAS 413, resulted in increased costs paid by the United States," id. at 19, and that Raytheon was consequently liable for interest under the CAS clause, id. at 23. The Board held that the appropriate interest calculation involved daily compounding because the statute which dictated the terms of the contract, 41 U.S.C. § 422(h), determines the interest rate by reference to 26 U.S.C. § 6621, which necessarily implicates the compounding methodology found in § 6622. Id. at 23.[6]

Raytheon petitioned for reconsideration, and the Board changed its decision. Raytheon Co., ASBCA No. 54907, 08-1 BCA ¶ 33,859 (Apr. 28, 2008) ("Final Decision"). In its Final Decision, the Board determined that its initial finding of noncompliance with CAS 413:

> was not based upon stipulated or undisputed facts but upon factual inferences drawn from a record that was not altogether clear on this point. An equally plausible factual inference was that appellant's payments were in fact allocated to the relevant current cost accounting periods by virtue of prior period adjustments. The record was silent and unclear on the accounting treatment of these payments. Summary judgment should have been denied to allow for further record development.

Id. at 2. Rather than vacate its order, however, the Board granted summary judgment to Raytheon on the theory that the segment closing adjustment contemplated by CAS 413 "did not result from a CAS violation . . . which is what the CAS statute and CAS clause require in order for appellant to be liable for a contract price adjustment and interest under these provisions." Id. at 2 (emphasis altered). Without this "cause and

---

[6] Raytheon conditionally appealed the Board's interest rate calculation on several grounds. We dismissed the appeal because there is no extant Board decision adverse to Raytheon. Raytheon Co. v. Gates, No. 2008-1542 (Fed. Cir. Nov. 6, 2008) (order dismissing Raytheon's appeal).

effect relationship" between the CAS violation and the adjustment, the Board determined that the "interest provisions under the CAS statute and CAS clause have no application under the facts of this case. Accordingly, the government is not entitled to interest under the CAS statute and the CAS clause." Id. at 3. The Government appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

We review decisions of the Board as set out in 41 U.S.C. § 609(b). On questions of law, our review is de novo. Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc). "Nonetheless, we give the Board's legal conclusions careful consideration due to the board's considerable experience in construing government contracts." Lear Siegler Servs. Inc. v. Rumsfeld, 457 F.3d 1262, 1266 (Fed. Cir. 2006) (internal quotation marks omitted). On questions of fact, the Board's decision "shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). Our review of the grant of summary judgment is de novo, reapplying the summary judgment standard. Lear Siegler, 457 F.3d at 1266. "When interpreting provisions of the CAS our task is 'to ascertain the [CAS Board's] intended meaning when it promulgated the CAS.'" Allegheny Teledyne, 316 F.3d at 1373 (quoting Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995)).

I

In general, a contractor must adjust the contract price to correct a CAS violation if (A) the Contractor fails to comply with an applicable Cost Accounting Standard, and (B)

such failure results in any increased costs paid by the United States. 48 C.F.R. § 52.230-2(a)(5). The CAS-clause adjustment provides for the payment of interest, but otherwise limits the Government's recovery to "the increased cost to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." Id.

## A. CAS Noncompliance

On the undisputed facts, it is clear that Raytheon violated CAS 413. The Board stated that the existence of a CAS violation was unclear because the record did not reflect the accounting treatment used to allocate Raytheon's segment closing adjustment. The accounting treatment, however, is not the relevant consideration. CAS 413-50(c)(12)(vii) provides, as noted above, that the segment closing adjustment must be allocated to the period in which the segment was closed. It further provides that contract prices must be "adjusted accordingly." CAS 413-50(c)(12)(vii). The requirement that contract prices be "adjusted accordingly" indicates that, as the CAS Board's promulgation comments state, "[u]nder this final rule, the [CAS 413-50(c)(12)] adjustment is determined as a current period adjustment." 60 Fed. Reg. 16534, 16539 (Mar. 30, 1995); see also Allegheny Teledyne, 316 F.3d at 1382–83 (holding that the prior version of CAS 413 requires a current period adjustment).

The conclusion that CAS 413 requires a current period adjustment (i.e., payment in the current period), rather than simply dictating the appropriate accounting treatment for the adjustment, is further supported by the treatment of an ongoing contractual relationship between the parties. Specifically, CAS 413 provides that "if the contractor continues to perform Government contracts, the contracting parties may negotiate an amortization schedule, including interest adjustments." CAS 413-50(c)(12)(vii)

(emphasis added). Thus, the rule explicitly requires interest in the event that the segment closing adjustment is credited to the Government over time. This requirement is inconsistent with Raytheon's contention that CAS 413 requires only an accounting allocation to the current period, rather than payment in the current period, and demonstrates that the CAS Board intended for the adjustment to be due in the period of the segment closing.

The record here is clear that Raytheon closed its Montek segment in 1998, and its REC segment in 2000. It is equally clear that Raytheon did not make the required segment closing adjustments until 2004. Nothing more is required to establish a violation of CAS 413-50(c)(12)(vii). Thus, the Board was incorrect when it stated that further development of the record was required to decide the CAS-compliance issue. Given that Raytheon clearly violated CAS 413, we next consider whether that violation resulted in increased costs paid to the Government.

### B. Increased Costs to the Government

The Board was incorrect in holding that Raytheon's CAS violation did not cause the Government to pay increased costs.[7] Its mistake stems from its consideration of the wrong payments when it evaluated whether the Government had made overpayments resulting from a CAS violation, which the Board did in both its decisions. In its Original Decision, the Board stated that the existence of a pension surplus established that the Government had paid increased costs. Original Decision at 18. That is, the Board

---

[7] "Increased costs shall be deemed to have resulted whenever the cost paid by the Government results from a change in a contractor's cost accounting practices or from failure to comply with applicable Cost Accounting Standards, and such cost is higher than it would have been had the practices not been changed or applicable Cost Accounting Standards complied with." 48 C.F.R. § 9903.306(a).

determined that when the Government paid its share of the pension costs for the now-closed segment, it had overpaid in the past.  While it is true that the "overpayments" that occurred prior to the segment closing were not the result of a CAS violation, there are other payments from the Government to Raytheon that the Board should have considered.  In particular, the Government appears to have had open contracts with Raytheon during the period in which the segments closed, and it made payments on those contracts that would have been lower if Raytheon had complied with CAS 413 by crediting those contracts.

The Government's payments to Raytheon during the periods in which the segments were closed are the relevant payments for determining the applicability of CAS noncompliance interest.  This court has held that, while CAS 413 looks to past contracts in measuring the amount of the required segment closing adjustment, the adjustment itself is implemented through contracts open during the period in which the segment is closed.  See Allegheny Teledyne, 316 F.3d at 1373 (affirming the Court of Federal Claims' holdings concerning a prior version of CAS 413 that "the amount of the adjustment that is recoverable depends on the . . . contracts under which the costs were paid" and that "the adjustment is effectuated in the current period, meaning it may be recovered under any flexibly-priced contract that remains open during the year of the segment closing").  This is so because CAS 413-50(c)(12)(vi) provides that the segment-closing adjustment "may be recognized by modifying a single contract, several but not all contracts, or all contracts, or by use of any other suitable technique."  Because CAS 413-50(c)(12) contemplates adjustment to any or all contracts that are open during the period of the segment closing, it is on these open contracts that the

Government has paid increased costs. That is, during 1998 (for Montek) and 2000 (for REC), CAS 413-50(c)(12) required that Raytheon adjust the prices of its open contracts. Raytheon did not do so. Thus, the Government overpaid on those contracts open during 1998 and 2000, and that overpayment was a result of Raytheon's failure to properly credit the segment closing adjustment in those periods as required by CAS 413-50(c)(12).[8]

Raytheon argues that we should consider only "<u>relevant contracts impacted by the noncompliance</u>," which Raytheon appears to interpret as the contracts under which the pension costs were collected. Raytheon argues that these are the only contracts that should be considered because the CAS statute prohibits the Government from recovering more "than the increased cost (as defined by the Board) to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." 41 U.S.C. § 422(h)(3); <u>see also</u> 48 C.F.R. § 52.230-2(a)(5). Raytheon similarly argues that each contract to which pension costs were allocated must be separately analyzed. With respect to most CAS provisions, Raytheon would be correct that each affected contract would be considered individually. <u>See</u> 48 C.F.R. § 52.230-6(b)(3) (Feb. 1995) ("Cost impact proposals submitted for failure to comply with an applicable CAS . . . shall identify the cost impact on each separate CAS covered contract."). However, as the

---

[8]    Raytheon argues that because the Government requested a check to cover Raytheon's segment-closing adjustment obligation rather than requesting a direct adjustment of contract prices, no contract prices would have been adjusted regardless of the timing of payment, and hence there would have been no increased costs paid by the Government on any individual contract. There is, of course, no economic difference between a cash payment and a credit made in the same period. Moreover, CAS 413 is unusual in that it does not require an analysis of individual contracts, but rather, as discussed below, affects all of the contractor's CAS-covered contracts. Thus, there is no reason to treat the Government's apparent preference for a cash payment over a credit as a waiver of its right to seek interest under the CAS clause.

Board correctly stated in its initial decision (and reaffirmed on reconsideration), CAS 413 is unusual:

> The current period adjustment provided for under CAS 413, by its terms, represents an adjustment of previously-determined pension costs for the segment as a whole, and does not require an impact analysis of individual contracts within the segment. This adjustment is not contract specific, nor does it involve a cost adjustment of any individual contract.

Original Decision at 19; see also Final Decision at 2. Thus, while Raytheon is correct that interest is available only after identifying increased costs paid on a CAS contract, the relevant contract payments are those made in the period of the segment closing—and those were clearly "increased" by the failure to credit the segment closing adjustment in the period required by CAS 413.

II

On remand, consequently, the only issue remaining will be the appropriate calculation of interest. In its Original Decision, the Board determined that "interest owed the government for a CAS noncompliance is to be compounded daily." Original Decision at 20. Raytheon argues that this is not the appropriate calculation, and that only simple interest is owed. The Board's initial analysis was correct.

Congress has set out the appropriate interest rate calculation for CAS violations at 41 U.S.C. § 422(h)(4). That section provides:

> The interest rate applicable to any contract price adjustment shall be the annual rate of interest established under section 6621 of title 26 for such period. Such interest shall accrue from the time payments of the increased costs were made to the contractor or subcontractor to the time the United States receives full compensation for the price adjustment.

Thus, the statute establishes the interest rate by reference to 26 U.S.C. § 6621. Relatedly, 26 U.S.C. § 6622(a) requires that:

> In computing the amount of any interest required to be paid under this title or sections 1961(c)(1) or 2411 of title 28, United States Code, by the Secretary or by the taxpayer, or any other amount determined by reference to such amount of interest, such interest and such amount shall be compounded daily.

This court has held that statutes which require interest payments at the rate set out in § 6621 require compound interest. See Canadian Fur Trappers Corp. v. United States, 884 F.2d 563, 568 (Fed. Cir. 1989) (discussing 19 U.S.C. § 1677g). Accordingly, because the amount of interest owed under § 422(h)(4) is calculated using the rate set out in § 6621, our precedent requires that it be compounded.

In Canadian Fur Trappers, this court considered the appropriate methodology for calculating interest to be used in relation to 19 U.S.C. § 1677g. 884 F.2d at 568. That section, just like § 422(h)(4), is located outside of title 26, but makes reference to the interest rate set out in § 6621. The Court of International Trade held that "[u]nder 26 U.S.C. § 6622, any interest calculated by reference to § 6621 is to be compounded daily." Canadian Fur Trappers Corp. v. United States, 691 F.Supp. 364, 372 n.4 (Ct. Int'l Trade 1988) (emphasis added). This court affirmed, stating that "[t]he clear meaning of [§ 1677g's reference to § 6621] is to start compounding interest" on the date § 1677g was revised to refer to § 6621. Canadian Fur, 884 F.2d at 568. While our opinion did not discuss § 6622, it could not have reached the holding it did without

establishing that all statutory references to § 6621 necessarily incorporate the compounding methodology in § 6622.[9]

Raytheon argues that § 6622 applies only when the rate in § 6621 is invoked by the tax code, or when a court awards post-judgment interest. Since § 422(h)(4) fits into neither category, Raytheon concludes that § 6622 does not apply. This argument is based on the language of § 6622, which applies to "interest required to be paid under this title [the tax code] or sections 1961(c)(1) or 2411 of title 28, United States Code [post-judgment interest] . . . or any other amount determined by reference to such amount of interest." Raytheon emphasizes that, if the language "any other amount determined by reference to such amount" is read to include § 6622's compounding methodology in all cases where a statute references the rate in § 6621, there would be no reason to include specific reference to 28 U.S.C. §§ 1961(c)(1) and 2411. Raytheon therefore concludes that this construction is impermissible under the principle that courts should avoid an interpretation that renders statutory language superfluous. See, e.g., United States v. Menasche, 348 U.S. 528, 538-539 (1955) (The Court will "give effect, if possible, to every clause and word of a statute" (quotation marks omitted)).

A second, closely related, point is that § 6622 requires compounding for an "amount of any interest required to be paid under this title or [two sections] of title 28 . . . or any other amount determined by reference to such amount of interest." (emphasis added). The antecedent to the phrase "such amount" is the amount required to be paid

---

[9] Raytheon relies on a decision of the Eleventh Circuit that declined to apply § 6622's compounding methodology in calculating interest as set out in 29 U.S.C. § 1132(g). Carriers Container Council, Inc. v. Mobile S.S. Assoc., Inc., 948 F.2d 1219 (11th Cir. 1991). The decisions of our sister circuits cannot permit us to disregard our own precedent.

under the enumerated statutes. Thus, the statute refers to (1) amounts due under title 26, (2) amounts due under 28 U.S.C. §§ 1961(c)(1), 2411, and (3) amounts calculated by reference to the amounts in the first two categories. While the statute considered in Canadian Fur Trappers, 19 U.S.C. § 1677g, refers to a rate defined in the tax code, it does not refer to an amount of interest required to be paid by the tax code. Thus, it would not appear to fall within the literal language of the statute.[10]

Despite the appeal of Raytheon's proposed interpretation of § 6622, our prior decision in Canadian Fur Trappers forecloses that view. Raytheon presents no argument for distinguishing that case, and we see no basis for doing so. A statutory reference to § 6621 located in title 19 is not meaningfully distinct from one located in title 41 so far as § 6622 is concerned. If 19 U.S.C. § 1677g requires compounding, as we have held, then § 422(h)(4) must as well.

Raytheon also relies on the Truth in Negotiations Act ("TINA"), Pub. L. No. 99-500, § 952, as evidence that § 6622 does not apply in all situations where an interest rate is determined by reference to § 6621. Raytheon notes that TINA refers to § 6621, and is implemented via the FAR as a simple interest requirement. 48 C.F.R. § 52.215-10(d) ("[T]he Contractor shall be liable to and shall pay the United States . . . (1) [s]imple interest on the amount of such overpayment . . . at the applicable underpayment rate . . . prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2)"). The obvious, critical distinction is that the FAR—and hence the relevant contracts—

---

[10]     Although this may support the proposition that Canadian Fur Trappers was erroneously decided, this panel cannot reach the opposite result. We must follow the prior precedent of this court.

expressly refer to simple interest.[11]  Here, in contrast, there is no such statement as to the type of interest, and the FAR implementation of the TINA provides no support for the notion that any federal agency has construed § 6622 differently than <u>Canadian Fur Trappers</u>.  Indeed, contrasting the reference to simple interest in FAR § 52.215-10(d)(1) with the lack of such a reference in the CAS clause suggests that there is a corresponding distinction in the appropriate calculation methodologies to be used.

The CAS clause—which serves as the basis for the interest award—simply implements § 422(h)(4).  <u>See</u> 48 C.F.R. § 52.230-2(a)(5).  The CAS clause essentially mimics the statutory language, providing for an adjustment "together with interest thereon computed at the annual rate established under section 6621 of the Internal Revenue Code of 1986 (26 U.S.C. 6621)."  The lack of any significant distinction between the CAS-clause and the statute it implements indicates that the regulation was intended to create the same interest liability contemplated by the statute—an interest liability that includes daily compounding.[12]

Finally, we note that the Board may exercise jurisdiction over the proper methodology for computing interest under the CAS clause.  Raytheon argues that, because the contracting officer initially asked for simple interest, the Board only had jurisdiction to affirm or deny the award of simple interest.  In general, "the scope of the

---

[11]     Whether this FAR provision properly implements the relevant statutes is a separate question.

[12]     This is not an improper reliance on parol evidence, as Raytheon contends. As noted above, "our task is 'to ascertain the [CAS Board's] intended meaning when it promulgated the CAS.'" <u>Allegheny Teledyne</u>, 316 F.3d at 1373 (quoting <u>Perry v. Martin Marietta Corp.</u>, 47 F.3d 1134, 1137 (Fed. Cir. 1995)).  The intentions of the CAS Board in promulgating the CAS clause are clearly influenced by the authorizing statute, and we look to § 422(h)(4) as part of this interpretation of the regulation that is incorporated into the contracts at issue.

contracting officer's decision . . . determines the extent of . . . the board's jurisdiction." Union Pacific Ins. Co. v. Roche, 294 F.3d 1367, 1369–70 (Fed. Cir. 2002) (citation and quotation marks omitted). As the Board correctly stated, "[t]hat the government on appeal seeks a different method of interest computation is of no jurisdictional significance. The matter of interest is properly before us, and we have jurisdiction over the manner and method of its calculation." Original Decision at 20.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the Board and hold that Raytheon is liable to the Government for compound interest under the CAS clause. We remand so that the Board may enter judgment for an amount of interest calculated in a manner consistent with this opinion.

## REVERSED AND REMANDED

## COSTS

No costs.