# United States Court of Appeals for the Federal Circuit

---

**RAYTHEON COMPANY,**
*Plaintiff-Cross-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2013-5004, -5006

---

Appeals from the United States Court of Federal Claims in No. 05-CV-0448, Judge Nancy B. Firestone.

---

Decided: April 4, 2014

---

KAREN L. MANOS, Gibson, Dunn & Crutcher LLP, of Washington, DC, argued for plaintiff-cross-appellant. With her on the brief were JOHN W.F. CHESLEY and GRETA B. WILLIAMS.

C. COLEMAN BIRD, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KIRK T. MANHARDT, Assistant Director. Of counsel on the brief was LAWRENCE S.

RABYNE, Attorney, Defense Contract Management Agency, of Arlington Heights, Illinois.

RICHARD D. BERNSTEIN, Willkie Farr & Gallagher LLP, of Washington, DC, for amicus curiae. With him on the brief were CARTER G. PHILLIPS and HOWARD STANISLAWSKI, Sidley Austin LLP, of Washington, DC.

————————————

Before REYNA, TARANTO, and CHEN, *Circuit Judges.*

REYNA, *Circuit Judge.*

This appeal concerns Raytheon Company's ("Raytheon") calculation and payment of pension fund adjustments pursuant to Cost Accounting Standard 413, 48 C.F.R. § 9904.413, following the sale of three business segments. The United States Government appeals the judgment of the Court of Federal Claims ("trial court") awarding Raytheon $59,209,967.30 as the Government's share of pension cost deficits related to two of the business segments. Raytheon cross-appeals the trial court's rejection of its request for recovery with respect to the third business segment on the basis that Raytheon applied the wrong asset allocation method in its adjustment calculation. We affirm the decision of the trial court.

I.

A. SEGMENT CLOSINGS

In this appeal, we address whether segment closing adjustments are ordinary "pension costs" subject to the Federal Acquisition Regulation's ("FAR") timely funding requirement. *See* 48 C.F.R. § ("FAR") 31.205-6(j)(2)(i).[1]

————————————

[1]    Unless otherwise indicated, all citations to the FAR and the Cost Accounting Standards are to the provi-

In the early 2000s, Raytheon underwent a major reorganization that involved the sale of at least eight business segments, including the three segments at issue in this appeal—Aircraft Integrated Systems ("AIS"), Optical Systems ("Optical"), and Aerospace Division ("Aerospace"). As part of each sale, Raytheon retained the assets and liabilities of the defined-benefit pension plans associated with those segments. Raytheon also calculated segment closing adjustments as required by the Cost Accounting Standards ("CAS"). Raytheon determined that, while some of its business segments had pension surpluses, the three segments at issue in this case had pension deficits. Although Raytheon paid the Government its share of the surpluses, the Government refused to pay its share of the deficits (which Raytheon calculated to be around $69 million).

On November 8, 2004, and January 24, 2005, Raytheon submitted certified claims for recovery of the deficits pursuant to the Contract Disputes Act. *See* 41 U.S.C. § 7103 (2011).[2] The contracting officer issued final decisions denying these claims on February 1, 2005, and March 7, 2005. The contracting officer concluded that the segment closing adjustments were subject to the FAR's timely funding requirement, and the pension deficits were therefore unallowable because Raytheon failed to fund the full amount of the pension deficits in the same year as the

---

sions in effect in 2001 and 2002, when Raytheon's segment closings took place.

[2] Before January 2011, this provision was codified at 41 U.S.C. § 605. In January 2011, Congress reorganized Title 41 of the United States Code to "remove ambiguities, contradictions, and other imperfections." Pub. L. No. 111-350 § 2(b), 124 Stat. 3677 (2011). This reorganization did not alter the substance of the provisions discussed here.

segment closings. *See* FAR 31.205-6(j)(2)(i). The contracting officer further concluded that Raytheon's segment closing calculations "do[] not comply with CAS 413[.]"

## B. APPLICABLE REGULATIONS

In general, whether a contractor is required to comply with the CAS depends on the dollar value and type of contracts it has received from the Government. *See* 48 C.F.R. §§ 9903.201-1 to -2. A standard contract clause at FAR 52.230-2, Cost Accounting Standards (Apr. 1998) (hereinafter the "CAS clause"), is incorporated into all CAS-covered contracts. The CAS clause requires the contractor to "[c]omply with all CAS, including any modifications and interpretations indicated thereto. . . ." FAR 52.230-2(a)(3). The CAS clause also allows the contractor or the Government to seek an equitable adjustment for any increased costs incurred due to a required change in the contractor's established accounting practices that were made to comply with future modifications to the CAS. *See id.* § 52.230-2(a)(4)(i).

Two CAS provisions generally govern the accounting treatment of pension costs—CAS 412 and CAS 413. CAS 412 requires contractors to fund pension costs within the cost accounting period in which those costs are assigned. 48 C.F.R. § 9904.412-50(d)(1). CAS 412 defines the components of a pension cost as the following:

> For defined-benefit pension plans, except for plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.

*Id.* § 9904.412-40(a)(1). CAS 412 also defines a defined-benefit pension plan as a type of pension plan in which "the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits." *Id.* § 9904.412-30(a)(10). Because a defined-benefit pension plan guarantees the payment of future benefits, the contractor must deposit enough money into the fund to cover all benefit payments to participants. Determining the proper amount to deposit into the fund first requires making estimates on a wide range of variables, such as the expected growth of the pension fund's assets and the length of time before participants retire. These estimates are known as "actuarial assumptions." The standards that guide actuarial assumptions are set forth in the CAS, which define an "actuarial assumption" as "an estimate of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, earnings on pension plan assets, changes in values of pension plan assets." *Id.* § 9904.412-30(a)(3).

CAS 412 requires a contractor to determine its pension costs for each cost accounting period using an "immediate-gain actuarial cost method" that takes into account the contractor's best actuarial estimates in light of past experience and reasonable expectations. *See id.* § 9904.412-40(b). To the extent this pension cost calculation results in an unfunded actuarial liability, CAS 412 requires the contractor to amortize this liability in equal annual installments for a period of 10 to 30 years. *See id.* § 9904.412-50(a). CAS 412 defines an unfunded actuarial liability as "[t]he excess of the actuarial accrued liability over the actuarial value of the assets of a pension plan." *Id.* § 9904.412-30(a)(2). In other words, a pension fund has an unfunded actuarial liability when the value of benefits already earned in prior years exceeds the estimated future value of the fund.

CAS 413 governs the adjustment and allocation of pension costs. In particular, CAS 413 provides for two types of pension cost adjustments: (i) adjustments based on actuarial gains and losses (i.e., differences between estimates and actual experience); and (ii) adjustments based on a closed segment's pension surplus or deficit. Normally, CAS 413 requires actuarial gains and losses to be amortized in equal annual installments over a 15-year period. *See* 48 C.F.R. § 9904.413-50(a)(2). When a business segment closes, however, there are no future periods within which to adjust the pension costs applicable to that segment. Accordingly, the Cost Accounting Standards Board ("CAS Board"), which has "exclusive authority to prescribe, amend, and rescind cost accounting standards," 41 U.S.C. § 1502(a)(1) (2011),[3] recognized that "a means must be developed to provide a basis for adjusting such costs," Preamble to CAS 413, 42 Fed. Reg. 37,191, 37,195 (July 20, 1977). Such a means was developed and is set forth in CAS 413.

CAS 413 requires the contractor, following a segment closing, to "determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment[.]" 48 C.F.R. § 9904.413-50(c)(12). The difference between the market value of the assets and the actuarial accrued liability for the closed segment represents an adjustment of previously-determined pension costs. Hence, the goal of a segment closing adjustment is to determine the present value of the pension plan at the time of the segment's closing and to adjust the plan's value to ensure it is fully-funded to meet the promises made to the plan's participants. The Government and the contractor then allocate the resulting surplus or deficit between them. In 1995, the CAS

---

[3]    Before January 2011, this provision was codified at 41 U.S.C. § 422.

Board amended CAS 413 to require, among other things, the use of a specific formula to determine the resulting allocation between the Government and the contractor. *See* 60 Fed. Reg. 16534, 16552 (Mar. 30, 1995). If the adjustment results in a surplus, the Government may be entitled to recover its share from the contractor. *See* 48 C.F.R. § 9904.413-50(c)(12)(vi). If the adjustment results in a deficit, the contractor may be entitled to recover its share from the Government. *See id.* The Government's share of any adjustment surplus or deficit is allocable to contracts within the same year as the segment closing. *Id.* § 9904.413-50(c)(12)(vii).

While CAS 412 and 413 govern the accounting treatment of pension costs, FAR 31.205-6(j) governs their allowability. In particular, this FAR provision requires all pension costs assigned to the current year to be "funded by the time set for filing of the Federal income tax return or any extension thereof." FAR 31.205-6(j)(2)(i). This timely funding requirement is repeated under subparagraph (j)(3), which addresses "defined-benefit pension plans," and provides that "pension costs (see 48 CFR 9904.412-40(a)(1)) assigned to the current accounting period, but not funded during it, shall not be allowable in subsequent years[.]" *Id.* § 31.205-6(j)(3)(i)(A). But subparagraph (j)(4), which addresses segment closings and requires that any "adjustment amount shall be the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12)," does not directly impose the timely funding provision. *Id.* § 31.205-6(j)(4)(i).

## C. TRIAL COURT DECISION

On April 5, 2005, Raytheon filed suit in the trial court, challenging the contracting officer's denial of its claims. Raytheon argued that the Government was required to pay its share of the deficits because the segment closing adjustments complied with the requirements of CAS 413. In response, the Government moved for

summary judgment on the grounds that Raytheon's segment closing adjustments did not comply with the FAR's timely funding requirement. The Government also argued in the alternative that it was entitled to a downward adjustment on any recovery by Raytheon to account for certain pension contributions made on contracts entered into before CAS 413 was amended in 1995.

On January 26, 2011, the trial court granted-in-part and denied-in-part the Government's motion for summary judgment. The trial court relied on two previous decisions to conclude that segment closing adjustments are not the type of "pension costs" subject to the FAR's annual timely funding requirement. *See, e.g.*, *Viacom, Inc. v. United States*, 70 Fed. Cl. 649 (2006); *Gen. Motors Corp. v. United States*, 66 Fed. Cl. 153 (2005). The trial court noted that the Government has "repeated the same arguments that this court has previously rejected in the other CAS 413 cases involving a deficit following a segment closing adjustment" and "has not provided the court with any reason to revisit its previous rulings." *Raytheon Co. v. United States*, 96 Fed. Cl. 548, 552 (2011) (*"COFC Decision I"*).

The case proceeded to trial, and on June 16, 2012, the trial court issued its decision in the case and determined that Raytheon was entitled to $59,209,967.30 for the Government's share of the deficit adjustments for the AIS ($56,276,815.61) and Aerospace ($2,933,151.69) segments. *See Raytheon Co. v. United States*, 105 Fed. Cl. 236, 302-03 (2012) (*"COFC Decision II"*). The trial court found that the Government did not meet its burden of proving that Raytheon's adjustment calculations for these two segments violated CAS 413.

The trial court also held that it lacked jurisdiction to consider the Government's request for a downward adjustment of Raytheon's recovery. The trial court concluded that the Government's equitable adjustment must take

the form of a claim under the Contract Disputes Act because it is "distinct from the segment closing adjustment" required under CAS 413-50(c)(12) and is instead based on the equitable adjustment provisions of the CAS clause, FAR 52.230-2. *COFC Decision II*, 105 Fed. Cl. at 286. The Government was thus required to submit its claim to the contracting officer for a final decision before it could be addressed by the trial court, which it failed to do. *See* 41 U.S.C. § 7103(a)(3) (2011).

Finally, the trial court found that Raytheon's adjustment calculation for the Optical segment was improper. Because Raytheon's pension plan covered multiple segments, CAS 413-50(c)(5) required Raytheon to use one of two methods to initially allocate a share of the pension's assets to the Optical segment. Raytheon's final adjustment calculation varied depending on which allocation method it used. Under the allocation method found at subparagraph (c)(5)(i), Raytheon calculated a pension deficit of $9,558,952 for the Optical segment. During trial, Raytheon's actuarial expert revised these calculations and came to the slightly lower deficit of $8,972,581. Under the alternative allocation method found at subparagraph (c)(5)(ii), Raytheon calculated a pension surplus of $11,438,570. The trial court determined that Raytheon could not use the (c)(5)(i) method to allocate pension assets to the Optical segment because the "necessary data" on the Optical segment's contributions to the pension fund were not "readily determinable" for the entire segment. Because Raytheon's alternative calculations under the (c)(5)(ii) allocation method resulted in an adjustment surplus, the trial court held that Raytheon was not entitled to any recovery for the Optical segment.

On appeal, the Government asks us to reverse the trial court's decision for three reasons. First, the Government asserts that the trial court erred in concluding that segment closing adjustments are not "pension costs" subject to the FAR's timely funding requirement. Second,

the Government argues that the trial court erred in placing the burden of proof on the Government to show that Raytheon's segment closing calculations violated CAS 413. Finally, the Government argues that the trial court erred in concluding that it lacked jurisdiction to decide the Government's request for a downward equitable adjustment. Raytheon cross-appeals the trial court's rejection of its adjustment calculation for the Optical segment.

We have jurisdiction under 28 U.S.C. § 1295(a)(3) and consider each of these issues in turn.

## II.

We review decisions of the trial court de novo "for errors of law and for clear error on findings of fact." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); *see also Scott Timber Co. v. United States*, 692 F.3d 1365, 1371 (Fed. Cir. 2012). "A [factual] finding may be held clearly erroneous when . . . the appellate court is left with a definite and firm conviction that a mistake has been committed." *Ind. Mich.*, 422 F.3d at 1373 (internal quotations omitted).

We also review legal interpretations of the CAS de novo. "When interpreting provisions of the CAS our task is 'to ascertain the [CAS Board's] intended meaning when it promulgated the CAS.'" *Gates v. Raytheon Co.*, 584 F.3d 1062, 1067 (Fed. Cir. 2009) (quoting *Allegheny Teledyne v. United States*, 316 F.3d 1366, 1373 (Fed. Cir. 2003)).

### A. TIMELY FUNDING REQUIREMENT

The Government's primary argument on appeal is that the trial court erred in concluding that segment closing adjustments are not "pension costs" subject to the timely funding requirement of FAR 31.205-6(j). We disagree.

We have previously interpreted CAS 413 and the provisions governing segment closing adjustments, albeit in the context of adjustment surpluses. *See, e.g.*, *DirecTV Group, Inc. v. United States*, 670 F.3d 1370 (Fed. Cir. 2012); *Gates v. Raytheon Co.*, 584 F.3d 1062 (Fed. Cir. 2009); *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003). In *Gates*, we recognized the unusual nature of segment closing adjustments and concluded that CAS 413 effectively looks to whether the Government has over- or under-paid, *in the past*, its share of pension costs for the now-closed segment. 584 F.3d at 1068. In *Allegheny Teledyne*, we similarly recognized, in the context of the pre-1995 version of CAS 413, that segment closing adjustments are treated differently than annual pension costs. 316 F.3d at 1381. But we have not yet had occasion to address the applicability of the FAR's annual timely funding requirement to segment closing adjustments resulting in pension deficits.

The Government's assertion that FAR 31.205-6(j) clearly defines a segment closing adjustment as a "pension cost" subject to the provision's timely funding requirement is incorrect. First, the Government ignores that neither CAS 412 nor CAS 413 treat a segment closing adjustment as a "pension cost" for purposes of the annual timely funding provision. CAS 412 specifically defines the four components of a pension cost, none of which include segment closing adjustments:

> For defined-benefit pension plans, except for plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.

48 C.F.R. § 9904.412-40(a)(1).

CAS 413 refers to segment closing adjustments as "adjustment[s] of previously-determined pension costs," which suggests that the segment closing adjustment is not itself a pension cost. 48 C.F.R. § 9904.413-50(12). The Preamble to CAS 413 further states that a segment closing adjustment "is not an actuarial gain or loss as defined in the Standard" and that the "the purpose of this provision is to serve as a basis for recognizing and adjusting costs *previously allocated* to the segment being terminated." 42 Fed. Reg. 37,191, 37,195 (July 20, 1977) (emphasis added).[4] The CAS Board thus intended to treat segment closing adjustments as something different from ordinary "pension costs" for purposes of CAS 412 and 413. *See Allegheny Teledyne*, 316 F.3d at 1381 (acknowledging that "the Board intentionally elected to treat a segment closing adjustment differently").

Second, the Government argues that "the dispositive issue is not whether the CAS 413 segment closing adjustment is a 'pension cost' for purposes of the CAS . . . [but] whether it is a 'pension cost' for purposes of the binding FAR regulation that governs the allowability of pension cost." This argument confuses the relationship between the CAS and the FAR's cost principles. Although the Government is correct that the FAR governs all matters of cost allowability, the CAS has exclusive au-

---

[4]   As noted in the FAR, "The preambles are not regulatory but are intended to explain why the Standards and related Rules and Regulations were written, and to provide rationale for positions taken relative to issues raised in the public comments." FAR 30.101(d). The Preambles are thus persuasive evidence of "the [CAS Board's] intended meaning when it promulgated the CAS." *Allegheny Teledyne*, 316 F.3d at 1373.

thority over the measurement, assignment, and allocation of costs. *See* 41 U.S.C. § 1502(a)(1) (2011).

In 1970, Congress empowered the CAS Board to "promulgate cost-accounting standards designed to achieve uniformity and constancy in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Pub. L. No. 91-379 § 103, 84 Stat. 796 (1970) (codified at 50 U.S.C. § 2168 (repealed 1988)). In 1988, Congress established a new CAS Board under the auspices of the Office of Federal Procurement Policy. *See* Pub. L. No. 100-679 § 5, 102 Stat. 4055 (1988) (codified at 41 U.S.C. § 1501 (2011)). By statute, the CAS Board has the "exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, . . . governing measurement, assignment, and allocation of costs to contracts with the Federal Government." 41 U.S.C. § 1502(a)(1) (2011). We have thus recognized that the CAS is the exclusive authority on issues regarding the allocation of costs to cost objectives. *See, e.g.*, *Gen. Elec. Co., Aerospace Grp. v. United States*, 929 F.2d 679, 680-81 (Fed. Cir. 1991); *United States v. Boeing Co.*, 802 F.2d 1390, 1394-95 (Fed. Cir. 1986). Of relevance to this appeal, the CAS Board has stated that "[a]llocability is an accounting concept involving the ascertainment of contract cost. It results from a relationship between a cost and cost objective such that the cost objective appropriately bears all or a portion of the cost." *Cost Accounting Standards Board Statement of Objectives, Policies and Concepts*, 57 Fed. Reg. 31,036, 31,037 (July 13, 1992).

While the CAS governs issues of measurement, assignment, and allocability, "it does not determine the allowability of categories or individual items of cost." *Id.* at 31,036. Allowability is instead governed by the cost principles set forth in the FAR. *See* FAR pt. 31. Allowability reflects a policy judgment that a particular cost incurred by the contractor should be paid by the Govern-

ment. "A contracting agency may include in contract terms, or in its procurement regulations, a provision that will refuse to allow certain costs incurred by contractors that are unreasonable in amount or contrary to public policy." 57 Fed. Reg. at 31,036. These same costs may nevertheless be allocable to the contract.

"We have specifically held that, if there is any conflict between the CAS and the FAR as to an issue of allocability, the CAS governs." *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1283 (Fed. Cir. 2002). The CAS's authority over "measurement of a cost" includes "defining the *components of costs*, determining the basis for cost measurement, and establishing the criteria for use of alternative cost measurement techniques." 48 C.F.R. § 9903.302-1(a) (emphasis added). The CAS therefore has the exclusive authority to define the components of a pension cost, while the FAR determines whether that cost—as defined by the CAS—is allowable and will be reimbursed by the Government.

Finally, the text of FAR 31.205-6(j) itself confirms our conclusion that segment closing adjustments are not ordinary pension costs subject to the timely funding requirement. The FAR explicitly recognizes the CAS's authority and requires "[t]he cost of all defined-benefit pension plans [to] be measured, allocated, and accounted for in compliance with the provisions of [CAS 412 and 413]." FAR 31.205-6(j)(2). The timely funding requirement under subparagraph (j)(3), which addresses defined-benefit pension plans, further directs the reader to CAS 412 when it uses the term "pension costs." *See id.* § 31.205-6(j)(3)(i)(A). On the other hand, subparagraph (j)(4), which addresses segment closing adjustments, directs the reader to CAS 413 and provides that the "adjustment amount shall be the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12). . . ." *Id.* § 31.205-6(j)(4)(i).

As discussed above, CAS 413 treats segment closing adjustments differently than ordinary "pension costs." The apparent purpose of the FAR's timely funding requirement, which is to ensure that contractors contribute to their pension funds on an annual basis, *see Gen. Motors Corp.*, 66 Fed. Cl. at 158, supports the distinction between "pension costs" and segment closing adjustments, which do not necessarily invoke the same accounting treatment under CAS 413. Indeed, CAS 413 allows contractors to allocate ordinary pension costs above the tax-deductible amount to future periods. *See* 48 C.F.R. § 9904.413-40(c). As noted by the CAS Board in promulgating this provision:

> For qualified defined-benefit pension plans, . . . [t]he cost assigned to a period is limited to the accrued cost that can be funded without penalizing a contractor. . . . Portions of pension costs computed for a period that fall outside of the assignable cost corridor ($0 floor and a ceiling based on tax-deductibility) *are reassigned to future periods.*

50 Fed. Reg. 16534, 16535 (Mar. 30, 1995) (emphasis added). At the same time, CAS 413 requires segment closing adjustments to be allocated to the same year as the segment closing, regardless of whether the adjustment (in the event of a deficit) is above the tax-deductible amount. *See* 48 C.F.R. § 9904.413-50(c)(12)(vii).

Nothing in the text of FAR 31.205-6(j) suggests that segment closing adjustments are subject to the provision's timely funding requirement. Accordingly, we hold that segment closing adjustments pursuant to CAS 413 are not subject to the timely funding provisions of FAR 31.205-

6(j), and Raytheon was not required to fund its pension deficits within the same year as the segment closings.[5]

## B. BURDEN OF PROOF

The Government also asserts that the trial court erred by placing the burden of proof on the Government to show that Raytheon's segment closing calculations did not comply with CAS 413. The Government argues that Raytheon should have the burden of proving its compliance with CAS 413 because it is affirmatively seeking reimbursement from the Government for these adjustment deficits. We do not agree.

Although we have not previously addressed this issue, both the trial court and the Armed Services Board of Contract Appeals ("ASBCA") have for years determined that the Government bears the burden of proving that a contractor's accounting practices do not comply with the CAS. *See, e.g.*, *Sikorsky Aircraft Corp. v. United States*, 110 Fed. Cl. 210, 219 (2013) ("The government bears the burden of proof to establish that the accounting method Sikorsky used from 1999 to 2005 did not comply with the CAS."); *Gen. Dynamics Corp.*, ASBCA No. 56744, June 21, 2011, 11-2 BCA ¶ 34,787 ("The burden of proof is on the government to establish noncompliance with the CAS."); *Unisys Corp.*, ASBCA No. 41135, Apr. 26, 1994, 94-2 BCA ¶ 26,894 ("In any appeal that involves alleged noncompliance with cost accounting standards, the burden is on the Government to establish the noncompliance."). As the

---

[5] The trial court was correct that Raytheon will be required to apply the judgment to the pension deficits for the AIS and Aerospace segments to the extent Raytheon has not made sufficient contributions to cover these deficits in the years following the segment closings. *See COFC Decision II*, 105 Fed. Cl. at 303 n.109 (citing *Gen. Motors Corp.*, 66 Fed. Cl. at 159).

ASBCA recognized, "allegations of noncompliance with cost accounting standards normally raise questions of fact concerning the acts or omissions which allegedly constitute a violation of an applicable standard, upon which the Government bears the burden of proof." *NI Indus., Inc.*, ASBCA No. 34943, Nov. 29, 1991, 92-1 BCA ¶ 24631. Although decisions of the ASBCA are not binding on this court, we nevertheless "give careful consideration and great respect to the Board's legal interpretations in light of the Board's considerable experience in the field of government contracts." *Donley v. Lockheed Martin Corp.*, 608 F.3d 1348, 1353 (Fed. Cir. 2010) (internal quotations omitted).

The Government concedes "that when [it] alleges contractor CAS noncompliance, the Government has the burden of proof[.]" It nevertheless makes the dubious argument that Raytheon is instead alleging CAS noncompliance by the Government. To the contrary, Raytheon challenges the contracting officer's final decisions concluding that Raytheon's segment closing calculations "do[] not comply with CAS 413[.]" Indeed, the relevant provisions appear to be primarily focused on ensuring that *the contractor* complies with the CAS and follows uniform and consistent cost accounting practices. *See* 48 C.F.R. § 9903.101 ("Public Law 100-679 . . . requires certain contractors and subcontractors to comply with Cost Accounting Standards (CAS) and to disclose in writing and follow consistently their cost accounting practices."); FAR 30.602-2 (discussing procedures for determining noncompliance with CAS requirements); FAR 52.230-2 (noting that "the Contractor, in connection with this contract, shall . . . . [c]omply with all CAS, including any modifications and interpretations indicated thereto").

The Government further argues that Raytheon should bear the burden of proof because Raytheon is asserting "affirmative claims" against the Government. We do not dispute the well-established rule that a contractor seeking

an equitable adjustment for increased costs has the burden of proving entitlement and quantum to its claim. *See Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991). But Raytheon is not seeking an equitable adjustment for a change in contract terms. Raytheon had an existing contractual obligation to calculate segment closing adjustments pursuant to CAS 413-50(c)(12). Raytheon's "obligation to perform an adjustment on the segment closing [pursuant to CAS 413] was a *preexisting contract requirement* that arises whenever a segment closes." *Allegheny Teledyne*, 316 F.3d at 1375 (emphasis added). Here, the Government bears the burden of showing that Raytheon did, in fact, fail to follow the terms of its contracts (i.e., that Raytheon's segment closing calculations do not comply with CAS 413). We therefore hold that the Government bears the burden to prove that a contractor's segment closing adjustment does not comply with the CAS, even if the adjustment is asserted in a claim brought by the contractor.

## C.   EQUITABLE ADJUSTMENT

Turning to the Government's request for an equitable adjustment, the Government argued before the trial court that it was entitled to a downward adjustment to Raytheon's segment closing calculations to account for certain pension contributions made on contracts entered into before 1995, when revised CAS 413 took effect. The trial court determined that it lacked jurisdiction over the Government's request for an equitable adjustment because the Government did not obtain a contracting officer's final decision on its claim. The trial court concluded that such an equitable adjustment was not within the scope of Raytheon's claims but was instead a separate and distinct claim that must follow the jurisdictional prerequisites of the Contract Disputes Act. As set forth below, the trial court was correct that it lacked jurisdiction to entertain the Government's claim under the Contract Disputes Act.

In general, an equitable adjustment is a fair price adjustment designed to account for a change in the contract. One type of contract "change" that entitles the Government or the contractor to an equitable adjustment is any required change in the contractor's cost accounting practices after the parties entered into the contract. *See* FAR 52.230-2(a)(4)(i). Entitlement to such an equitable adjustment derives from the standard CAS clause, FAR 52.230-2, and not from any provision in the CAS.

For this argument, the Government does not assert that Raytheon's segment closing calculations fail to comply with revised CAS 413. Rather, the Government asserts that Raytheon's use of revised CAS 413 effectively "changed" certain contracts that Raytheon entered into before CAS 413 was amended in 1995. Prior cases from the trial court have recognized that the use of revised CAS 413—and the inclusion of pension costs made under pre-1995 contracts in the recovery calculation—could result in a change in the parties' expectations and accounting practices on contracts that incorporated the original provisions of CAS 413. *See, e.g.*, *Viacom*, 70 Fed. Cl. at 662; *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 186-87 (2001), *aff'd*, 316 F.3d 1366 (2003). The contractor or the Government therefore may be entitled to an equitable adjustment for this change to the extent the segment closing calculation under revised CAS 413: (i) involves the adjustment of pension contributions made under contracts that did not include the terms of revised CAS 413; and (ii) results in a larger amount owed than under the original provisions of CAS 413.

This equitable adjustment, however, is separate and distinct from the calculation of a segment closing adjustment required by CAS 413. Under the original (pre-1995) provisions of CAS 413, the Government or the contractor could only recover the portion of a segment closing surplus or deficit attributable to pension contributions made under cost-type contracts. *Allegheny Teledyne*, 316 F.3d

at 1376-77. In 1995, however, the CAS Board revised CAS 413 to allow recovery under both cost-type contracts and fixed-price contracts. *See* 48 C.F.R. § 9904.413.50(c)(12)(vii). Because segment closing adjustments are to be calculated as of the date of the segment's closing, the contractor is required to follow revised CAS 413 for any segment closing that occurred after 1995, even if the segment's contract portfolio includes contracts entered into before 1995.

The downward adjustment sought by the Government here is thus not an aspect of the segment closing adjustment calculation required by CAS 413—which was the subject of the suit before the trial court—but instead derives from the provisions of the CAS Clause, FAR 52.230-2. "An action brought before the Court of Federal Claims under the [Contract Disputes Act] must be based on the same claim previously presented to and denied by the contracting officer." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (internal quotations omitted). Accordingly, the Government's claim under FAR 52.230-2 for an equitable adjustment is outside the scope of Raytheon's segment closing adjustments and must take the form of a separate claim under the Contract Disputes Act subject to a written decision by the contracting officer.

It is a bedrock principle of government contract law that contract claims, whether asserted by the contractor or the Government, must be the subject of a contracting officer's final decision. *See* 41 U.S.C. § 7103(a)(3) (2011). Before January 2011, the relevant provision was codified at section 605(a), which provided:

> All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. . . . The contracting officer shall issue his decisions in writing, and

shall mail or otherwise furnish a copy of the decision to the contractor.

41 U.S.C. § 605(a). Under the Contract Disputes Act, obtaining a final decision is a jurisdictional prerequisite to any subsequent action before a Board of Contract Appeals or the trial court. *See, e.g.*, *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc). The purpose of this requirement is "to create opportunities for informal dispute resolution at the contracting officer level and to provide contractors with clear notice as to the government's position regarding contract claims." *Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998). This jurisdictional prerequisite applies even when a claim is asserted as a defense. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010) (holding that a party "seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the [Contract Disputes Act], whether asserting the claim against the government as an affirmative claim or as a defense to a government action").

There is no evidence in the record of a contracting officer's final decision in which the Government asserts this equitable adjustment against Raytheon. Nor does the contracting officer's final decision denying Raytheon's request for recovery of the Government's share of the pension deficits alert Raytheon of the Government's entitlement to this equitable adjustment. Therefore, because the Government's equitable adjustment claim was never the subject of a contracting officer's final decision, the trial court lacked jurisdiction to decide the issue.

### D.  Raytheon's Cross-Appeal

Raytheon cross-appeals the trial court's decision denying any recovery related to the Optical segment.  Raytheon challenges the trial court's finding that Raytheon did not have sufficient "readily determinable" data on the Optical segment's contributions to the pension fund to use the asset allocation method of CAS 413-50(c)(5)(i) in its segment closing calculation.  We affirm.

When a pension plan covers multiple business segments and one of those segments closes, CAS 413 requires the contractor, as part of its segment closing calculation, to make an initial allocation of a share of the pension's assets to the closed segment.  48 C.F.R. § 9904.413-50(c)(12)(ii).  This allocation must be made in accordance with the methodology outlined in CAS 413-50(c)(5).  In particular, this provision requires contractors to use one of the following two methods to make this initial allocation:

(i)  If the necessary data are readily determinable, the funding agency balance to be allocated to the segment shall be the amount contributed by, or on behalf of, the segment, increased by income received on such assets, and decreased by benefits and expenses paid from such assets. . . . ; or

(ii) If the data specified in paragraph (c)(5)(i) of this subsection are not readily determinable for certain prior periods, the market value of the assets of the pension plan shall be allocated to the segment as of the earliest date such data are available.  Such allocation shall be based on the ratio of the actuarial accrued liability of the segment to the plan as a whole, determined in a manner consistent with the immediate gain actuarial cost method or methods used to compute pension cost.

*Id.* § 9904.413-50(c)(5). A contractor can only use the allocation method described in CAS 413-50(c)(5)(i) if "the necessary data" on the segment's contributions to the pension fund "are readily determinable." Otherwise, the contractor must use the allocation method described in CAS 413-50(c)(5)(ii).

Optical was first established as a segment in 1990 by Hughes Aircraft Company ("Hughes"), which acquired a division of PerkinElmer Corporation. At that time, employees of the Optical segment were covered by Hughes's pension plan, known as the Hughes Nonbargaining Plan. Although the Hughes Nonbargaining Plan initially required regular employee contributions, the plan became noncontributory for all employees hired after December 1, 1991. Existing employees, however, were allowed to continue making contributions to the plan if they chose. The only employer contribution that was made to the Plan while it covered the Optical segment occurred in 1991, when Hughes made a $55,172,000 contribution. Because the plan as a whole was over-funded, no additional employer contributions were made. In 1997, Raytheon and Hughes merged, and Raytheon placed all former Hughes employees (including employees of the Optical segment) on the Raytheon Nonbargaining Plan, which covered a number of additional business segments.

Following Raytheon's sale of the Optical segment in 2001, it initially calculated a segment closing deficit of $9,558,952. During trial, Raytheon's actuarial expert revised these calculations and came to the slightly lower deficit of $8,972,581. It arrived at these numbers by separating the noncontributory participants from the contributory participants and calculating different adjustments for these two groups. For contributory participants, Raytheon applied the ratio of pension liabilities attributable to those contributory participants who worked at Optical compared to all contributory participants covered by the plan. As the trial court noted, this

"is the method identified in (c)(5)(ii)." *See id.* § 9904.413-50(c)(5)(ii) ("Such allocation shall be based on the ratio of the actuarial accrued liability of the segment to the plan as a whole[.]"). For noncontributory participants, however, Raytheon used the (c)(5)(i) allocation method after assuming that the $55,172,000 contribution was for the sole benefit of the noncontributory participants, which gave Raytheon a data point from which it could "readily determin[e]" the necessary data. Using these two methods, Raytheon calculated an adjustment deficit for the noncontributory participants and a surplus for the contributory participants.

The trial court disagreed with Raytheon's "mixed" calculation and held that Raytheon should not have used different allocation methods for the contributory and noncontributory participant groups. The trial court concluded that Raytheon ignored the significant pension surplus associated with the pension plan as a whole and relied on assumptions that were contrary to fact. In particular, the court noted that Raytheon "erroneously assumed that the noncontributory participants are not beneficiaries of the pension surplus in the Nonbargaining plan and then incorrectly created a separate and identifiable pension deficit attributable to the noncontributory participants in that plan." *COFC Decision II*, 105 Fed. Cl. at 295-96. The trial court also found that Raytheon ignored that the $55 million contribution was for the plan as a whole and was used to pay the benefits of both contributory and noncontributory participants.

On appeal, Raytheon argues that the trial court erred in its interpretation that the (c)(5)(i) allocation method does not permit the use of reasonable estimates and assumptions. Contrary to Raytheon's contentions, the trial court explicitly acknowledged that the (c)(5)(i) allocation method permits reliance on reasonable estimates and assumptions. As the trial court noted, this allocation method may be used whenever "there is sufficient 'readily

determinable' data available to support reasonable assumptions regarding the segment's contribution to the pension asset base as a whole." *Id.* at 295. The trial court rejected Raytheon's adjustment calculation because Raytheon "made assumptions in its (c)(5)(i) calculations that were contrary to the facts." *Id.* Hence, contrary to Raytheon's argument, the trial court did not conclude that (c)(5)(i) prohibits the use of assumptions.

Nor did the trial court determine that CAS 413 prohibits a contractor from separately calculating assets and liabilities of different groups of employees within the same segment. The trial court instead reasoned that a contractor must be consistent in the method it uses to allocate pension assets across the entire segment. The trial court's conclusion is supported by the text of CAS 413-50(c)(5), which requires a contractor to allocate "a share in the undivided market value of the assets of the pension plan *to that segment*," using one of two allocation methods, and not a mix of allocation methods. CAS 413-50(c)(5) (emphasis added). This language thus implies that the contractor will use the same method to allocate assets across the entire segment and may not switch methods to allocate assets to different groups within the same segment. We therefore hold that CAS 413-50(c)(5) requires contractors to apply the same allocation method across the entire segment. As a result, we affirm the trial court.

### III.

We have considered the parties' other arguments, but as they do not affect the outcome of our decision, we do not address them. We therefore affirm the decision of the trial court.

**AFFIRMED**

COSTS

Each side shall bear its own costs.